RAILWAY LABOR EXECUTIVES
ASSOCIATION, Plaintiff,

v.

BOSTON & MAINE CORPORATION,
Delaware & Hudson Railway Company,
Maine Central Railroad Company, and
Portland Terminal Company, Defendants.

The BOSTON & MAINE CORPORATION, Delaware & Hudson Railway
Co., Maine Central Railroad Company,
and Portland Terminal Company,
Plaintiffs,

v.

UNITED TRANSPORTATION UNION,
Sheetmetal Workers International Association, Brotherhood of Railroad Signalmen, Brotherhood of Locomotive
Engineers, Brotherhood of Railway
Carmen, International Brotherhood of
Boilermakers, Iron Ship Builders,
Blacksmiths, Forgemen & Helpers,
Brotherhood of Railway, Airline &
Steamship Clerks, International Brotherhood of Firemen & Oilers, International Association of Machinists, and
International Association of Electrical
Workers, Defendants.

Civ. Nos. 86–0122 P, 86–0194 P.

United States District Court,
D. Maine.

July 11, 1986.

Memorandum of Decision and Order on
Motion for Stay Pending Appeal
July 14, 1986.

Bruce Read, Craig J. Rancourt, Biddeford, Me., John O'B. Clarke, Thomas P. Murphy, Kimberlay A. Madigan, Highsaw & Mahoney, Washington D.C., for plaintiffs.

Ralph J. Moore, Jr., Shea & Gardner, Washington D.C., for co-counsel for Boston & Maine, et al.

Charles S. Einsiedler, Jr., Portland, Me., for Boston & Maine; Del & Hudson; MCRR; PTC.

Warren D. Hutchinson, James E. Howard, Kirkpatrick & Lockhart, Boston, Mass., Jay S. Blumenkopf, Drummond Woodsum, Portland, Me., for Guilford.

P. Benjamin Zuckerman, Robert J. Keach, David C. Hillman, Verrill & Dana, Mathew L. Caras, Portland, Me., for debtor.

William Black, Portland, Me., trustee.

Stanley Greenberg, Portland, Me., for Creditor's Committee.

John E. O'Keefe, John D. Molloy, Kinga LaChapelle, B & M Corp., Billerica, Mass., Ralph J. Moore, Jr., William F. Sheehan, Richard M. Wyner, Shea & Gardner, Washington D.C., for plaintiffs.

James F. Freely, Jr., Phillip E. Cleary, Boston, Mass., for United Trans. Union.

Gregory Flynn, Boston, Mass., for MBTA.

George Cahill, Cahill Goetsch & DiPersia, P.C., New Haven, Conn., Martha Sossman, Asst. U.S. Atty., John O'B. Clarke, Jr., Thomas P. Murphy, Highsaw & Mahoney, P.C., Washington D.C., Robert T. Naumes, Malone & Naumes, Boston, Mass., for United Trans. Union.

Paul Kelly, Segal Roitman & Coleman, Boston, Mass., for Bros of Loc. Engineers.

GENE CARTER, District Judge.

### I. *Procedural Background*

This is an action arising under the Railway Labor Act (hereinafter "RLA"), 45 U.S.C. §§ 151, *et seq.* The Plaintiff, Railway Labor Executives' Association (hereinafter "RLEA"), is a voluntary, unincorporated association of the Chief Executive Officers of nineteen standard labor organizations which collectively represent virtually all organized railroad employees in the nation.

The Defendants are common carriers by railroad engaged in interstate commerce. Boston & Maine Corporation (hereinafter "B & M") transports passengers in Massachusetts and Vermont and freight in New York, Massachusetts, Maine, New Hampshire, Vermont and Connecticut. Delaware & Hudson Railway Company (hereinafter "D & H") transports freight in New York, Pennsylvania, New Jersey, Maryland and Virginia. Maine Central Railroad Company (hereinafter "MEC") transports freight in Maine, New Hampshire and Vermont. Portland Terminal Company (hereinafter "PT") provides switching and terminal services in Portland, Maine. MEC, D & H and B & M are owned by Guilford Transportation Industries, Inc. (hereinafter "Guilford"), which is headquartered in North Billerica, Massachusetts. PT is a wholly-owned subsidiary of MEC. Together, MEC/PT, D & H and B & M constitute the Guilford Rail System.

This matter is now before the Court for adjudication on the merits of the Plaintiff's claim for a permanent injunction requiring the four carrier Defendants in Civil No. 86–0122–P to restore the status quo of the relationship between *each* carrier and its contract labor force pursuant to section 10 of the RLA (45 U.S.C. § 160). The labor dispute which underlies this claim arose out of negotiations prior to April 2, 1984, between the Maine Central Railroad Company and its wholly-owned subsidiary, Portland Terminal Company, (hereinafter "MEC/PT") and the Brotherhood of Maintenance of Way Employes (hereinafter "BMWE").

Action Civil No. 86–0122–P, was commenced by the RLEA on March 24, 1986, in this Court by a Complaint that sought, *inter alia,* preliminary and permanent injunctive relief protecting the rights of the membership of the unions throughout the Guilford system to honor BMWE picket lines established at the property of any Guilford carrier and to enforce the carrier's obligations under section 2, First of the RLA to exert every reasonable effort to maintain existing agreements. Action Civil No. 86–0194–P was originally commenced by the Guilford carriers in the United States District Court for the District of Massachusetts on April 26, 1986, by a Complaint which sought preliminary and permanent injunctive relief against the memberships of some eleven craft unions barring

those memberships from, *inter alia,* any picketing of or work stoppage against the Guilford carriers "over the carriers' April 21, 1986, notices or the subject matter of those notices."[1] Complaint at 6–7. A Temporary Restraining Order was entered therein by Keeton, D.J., on April 26, 1986, enjoining both parties from implementing any self-help in respect to the April 21, 1986 notices of the carriers. On May 13, 1986, with the consent of the parties, the TRO was extended by Wolf, D.J., until decision on the Plaintiffs' motion for a preliminary injunction. Judge Wolf filed a Memorandum and Order on May 5, 1986, staying further proceedings in the matter in the United States District Court for the District of Massachusetts until this Court could decide whether these matters should proceed together in the District of Maine or the District of Massachusetts.

On May 16, 1986, this Court entered its Memorandum of Opinion and Order, denying in Civil No. 86–0122–P the Defendant's motion to transfer the case to the United States District Court for the District of Massachusetts. On the same day, the President issued Executive Order No. 12557, which established Emergency Board No. 209 pursuant to section 10 of the RLA to investigate the controversy between the parties and report to the President concerning the dispute. On May 22, 1986, Judge Wolf entered an Order in Civil No. 86–0194–P (then C.A. No. 86–1327–W on the

---

**1.** The April 21, 1986 notice referred to is Plaintiff's Exhibit 10(a). That is the notice which was sent to all the employees represented by the fifteen unions representing employees of one or more of the four Guilford carriers. The notice was also sent to the General Chairman of each of those unions. The notice provided as follows:

This constitutes notice that you are expected to report back to work on or before April 25, 1986. Employees who are not reporting for work or whose assignment has been abolished as well as employees furloughed prior to the strike should contact their supervisor for assistance in reassignment or other instruction. The seniority rights of employees who return will be observed, except that employees who have chosen not to work to this date will not be allowed to displace a junior employee with an employment relationship

prior to March 4, 1986, who has been reporting to work.

The assignments of employees who choose not to report back to work on or before April 25, 1986, will be filled with permanent replacements as required by the carrier.

Plaintiff's Exhibit 10(a). The notice was issued to employees of D & H and B & M at a time when none of them were striking their employers but when they had been for a period of time respecting secondary picket lines put up by BMWE employees of MEC/PT. It was this notice which precipitated threats of strikes against B & M and D & H by their respective employees and the commencement of the Massachusetts action, now Civil No. 86–0194–P, by the Guilford carriers resulting in the issuance of Judge Keeton's Temporary Restraining Order of April 26, 1986, entered therein.

docket of the Massachusetts Court), transferring that case to this Court for joinder with Civil No. 86–0122–P, pursuant to this Court's Order of May 16, 1986.

This Court endorsed, on May 23, 1986, with the consent of counsel, the Plaintiffs' then pending motions for preliminary injunctive relief as requiring no Court action because they had been rendered moot by the Executive Order creating Emergency Board No. 209. The members of the Board were appointed on that same day, and since that time hearings have been held by the Board which resulted in the issuance on June 20, 1986, of the Report to the President by Emergency Board No. 209. (Defendants' Exhibit 55.) The Temporary Restraining Order entered by Judge Keeton, as extended by the terms of the Consent Order entered by Judge Wolf, expired on June 2, 1986. The cases were consolidated for further proceedings by a Bench Order.

Plaintiffs in the consolidated matters, on May 19, 1986, filed a motion for a new temporary restraining order requiring the Guilford carriers to observe the status quo created by section 10 of the RLA with the issuance of the aforesaid Executive Order. This motion was denied by the Court's Order filed on May 23, 1986. Plaintiff had filed on May 20, 1986, a motion for a preliminary injunction to the same effect and an amendment to the Complaint, seeking a permanent injunction to that effect. After pretrial conferences and discovery, these requests were set for hearing to commence on June 18, 1986. At the commencement of the hearing, the Court granted, over the Defendants' objections, the Plaintiff's motion to amend the Complaint and its motion to advance the trial on the merits of Plaintiff's claim for a permanent injunction and to consolidate that trial with the hearing on the preliminary injunction. The hearing was held in the period June 18–24, 1986. The matter is now properly postured for adjudication of the Plaintiff's claim for a permanent injunction.

## II. *Findings of Fact*

On April 2, 1984, in compliance with section 6 of the Railway Labor Act (45 U.S.C. § 156), the BMWE served notice on MEC/PT of its desire to accomplish changes in numerous provisions of the existing collective bargaining agreements. For purposes of section 10, this is when the "dispute" arose. In negotiations leading up to this notice BMWE attempted to obtain a protective-type agreement to stanch the massive furlough practices of MEC/PT in respect to maintenance of way employees. Tr., Vol. 2, at 2.[2] In 1981–82 there were 350 to 400 maintenance of way employees during the carrier's peak seasonal period. By October 1985 the size of that work force was 120 to 165. *Id.* at 2–3. The section 6 notice sought primarily to achieve contract terms that would (1) afford greater job protection for BMWE members than existed under the existing collective bargaining agreement and (2) limit the carrier's right to achieve reductions in the work force of contract labor by future job abolishments.

The parties did not resolve the dispute through negotiations, and on September 19, 1984, the BMWE applied to the National Mediation Board (hereinafter "NMB") for its assistance. Mediation followed, and on September 26, 1985, in accordance with section 5, First (45 U.S.C. § 155, First) of the Railway Labor Act, the NMB proffered arbitration which was declined by BMWE on October 2, 1985. The NMB notified the parties that they were required to maintain the status quo for thirty days without resort to self-help under section 5, First, of the Act (45 U.S.C. § 155, First).

The parties, MEC/PT and BMWE, entered into an agreement dated November 13, 1985, (Plaintiff's Exhibit 1) by which the Carrier agreed to a moratorium on thenproposed job abolishments and both parties agreed, *inter alia*, to a moratorium on the exercise of self-help through February 28, 1986. Under this moratorium agreement, as of November 18, 1985, there was a com-

---

**2.** The Court has numbered the volumes of the original transcript in red numerals. Citations

to the transcript refer to these volume designations and to page designations.

bined maintenance of way work force of 123 on MEC/PT. *Id.* at 6. The moratorium agreement expired on February 28, 1986, and on that date both sides were free to resort to self-help. *Id.* at 5.

The parties met on several occasions, the last being March 3, 1986, and were unable to resolve their differences. On February 28, 1986, MEC/PT abolished 15 to 20 maintenance of way positions. *Id.* at 33–34. In response to that action, on March 3, 1986, BMWE exercised self-help and initiated a strike against PT and established pickets against it. On March 4, BMWE struck and established pickets against MEC. *Id.* at 8. On March 5, BMWE established pickets against B & M and on March 17 initiated pickets against D & H. *Id.* BMWE did not strike against B & M and D & H. *Id.* at 12. Less than two percent of the contract employees of the four carriers crossed BMWE's picket lines. *Id.* at 9.

Immediately upon the establishment of picket lines on MEC/PT, all employees who held a position that was covered by a collective bargaining agreement and who honored the picket lines were informed by the carrier that their positions were temporarily abolished. *Id.* at 170, 174. After the picketing began on B & M and D & H those carriers, on or about April 2, 1986, also abolished all of their contract labor positions. Cronin Dep., 5/29/86, at 19. These early job abolishments were intended to be temporary in nature and it was the carrier's intent that the jobs be restored upon termination of the strike. *Id.* While the strike against MEC/PT was in progress all four carriers suspended their labor contracts. Tr., Vol. 2, at 193. Once the strike ended, the labor contracts were intended to go back into place. *Id.* at 193–94.

Various legal proceedings were commenced by the carriers and BMWE further extended its self-help action to selected railroads beyond the confines of the Guilford system. Between April 9 and 14, 1986, the carriers became aware that the American Association of Railroads had recommended to the NMB that it ask the President to appoint an Emergency Board. *Id.* at 194.

The carriers were also aware on April 14 that the NMB had in fact asked the President to appoint an Emergency Board. *Id.* at 195. After they became aware of this, and believing that the appointment of an Emergency Board and issuance of a back-to-work order was imminent, the carriers decided to permanently abolish the positions of all employees who were honoring BMWE's picket lines and did so on or about April 18, 1986. The employees whose jobs were permanently abolished were the same employees whose positions were earlier temporarily abolished for the term of the strike. *Id.* at 195–96; Cronin Dep., 5/29/86, at 18. No employee who crossed BMWE's picket lines had his/her position abolished. Cronin Dep., 5/29/86, at 17.

Regardless of the various reasons given for these abolishments by the carrier, the Court finds that *the effect* of the permanent abolishments was to discriminate against employees who exercised their rights to honor picket lines. The fact that only employees who honored BMWE's picket lines had their jobs abolished leads the Court to conclude that the purpose of this action was to discriminate against and to punish employees who had continued to honor BMWE's picket line.

On April 21, 1986, the carriers sent a notice bearing that date to all employees who were honoring BMWE's picket lines. *See, supra,* at 3, n. 1. The implementation of the policy established by the notice resulted in any employee who had up to that time exercised the right to honor the BMWE picket lines and who did not return to work by April 25 losing all displacement rights under the collective bargaining agreement against employees who had worked during the strike.

Contract provisions and past practices on all the carriers require that an employee whose position has been abolished exercise his seniority by displacing a more junior employee from an unabolished position within a specified period. Cronin Affidavit, ¶ 4; Tr., Vol. 2, at 24, 60. This practice is known as "bumping" or "bunting." At some locations on B & M's property, to

exercise a "bump," an employee must physically go into the junior employee's work area, tap him on the shoulder and inform him that he is being displaced. If a picket line is in place, that requires the senior employee to cross a picket line in order to exercise his displacement right. *Id.* at 431–33. On all of the carriers, after exercising displacement rights by "bumping," the senior employee must be able to commence at the next scheduled shift performance of the job responsibilities of the junior employee who has been displaced by the "bump." Cronin Dep., 6/4/86, at 25. To do so, he is obviously required to cross any picket line that may be in place.

During the strike, the carriers insisted on compliance with the bumping rule. The rigid application of these rules, while the strike or secondary picketing was going on, forced the senior employees to choose between their right to honor a union picket line and their seniority and displacement rights. Virtually none of the B & M and D & H employees honoring BMWE's picket lines whose positions were permanently abolished on or about April 18, 1986, exercised their seniority displacement rights by "bumping" junior employees within the time limits under their respective labor agreements. *Id.* at 33.

The subject labor agreements also require that an employee whose position is abolished and who does not exercise his displacement rights in a timely fashion file his name and address with the carrier within a specified period of time. The agreements provide that a failure to do so can result in the loss of that employee's seniority. *Id.* at 31–32. This rule has not been strictly enforced in the past on any of the carriers.

The evidence discloses a past instance of a maintenance of way employee having his seniority terminated because of failure to comply with the rule. Tr., Vol. 2, at 25, 56, 365. The evidence also discloses that on January 29, 1985, the MEC/PT eliminated the seniority of 17 employees for failure to comply with the rule while carrying out a review to update seniority rosters. This seniority termination rule is not automatically or summarily imposed under past practice. On the B & M, for example, it was usual practice for such terminations to be conferenced between management and the union representative and BMWE would be given an opportunity to notify individuals who had not filed their names and addresses of the danger to their seniority. In fact, this is the practice that was followed in connection with the January 29, 1985, seniority terminations. Tr., Vol. 4, at 17–18.

This prior practice was disregarded when the carriers on May 27, 1986, unilaterally terminated the seniority of all employees who did not file their names and addresses in a timely fashion during the strike following a failure to exercise their displacement rights. The effect of this decision is that 145 BMWE employees on the B & M were notified that their seniority had been terminated. Tr., Vol. 2, at 26. The D & H did not apply the seniority termination rule in question against its Brotherhood of Railroad Signalmen employees. Twenty-four out of twenty-six employees did not file their names and addresses, but none of those twenty-four had their seniority terminated. *Id.* at 408. Thus, it is apparent that the carriers selectively enforced this contract provision.

Immediately upon learning that the President had created an Emergency Board in respect to the dispute between MEC/PT and its employees, the RLEA, on behalf of all labor organizations on the carriers' properties, made unconditional offers to all four carriers for an immediate return to work. *Id.* at 10–11, 211; Plaintiff's Exhibits 2, 3. On May 19, 1986, the MEC/PT allowed all of their striking employees to return to the positions they had held before the strike and retained them throughout the week of May 19th. During that week, however, the carrier issued job abolishment notices applicable to 44 percent of the contract labor force. Peters Affidavit, ¶¶ 2, 3; Tr., Vol. 4, 119.

The B & M and D & H, however, did not recall their entire pre-strike work force.

Those carriers took the view that their labor agreements continued to be suspended until determinations could be made as to the number of contract employees required to operate after cessation of the secondary picketing against those carriers and the requisite number of positions could be bulletined for bidding and an award could be made. Tr., Vol. 2, at 212–15. This process took slightly in excess of five days, during which period those carriers continued to use management personnel and replacement employees hired during the secondary picketing to do contract work. *Id.* at 212–13. Ultimately, through the process of bulletining and award of positions, the D & H restored approximately 50 percent of its pre-strike positions, while the B & M restored approximately 55 percent. Carr Affidavit, at 2.

Further findings of fact will be made in the course of the discussion of specific issues as such findings may be pertinent to the discussion.

### III. The Applicable Legal Standards Under the Railway Labor Act

#### A. The Obligations Imposed by the Act

All of the carriers which are parties to this action, and all of their employees, are subject to the statutory obligation set forth in section 2, First, of the Railway Labor Act, which requires them

> to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes ... in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152, First. This duty, which is "central to the effective working of the Railway Labor Act," is a legal obligation "enforceable by whatever means might be

developed on a case-by-case basis." *Chicago & Northwest Railway Co. v. United Transportation Union*, 402 U.S. 570, 578, 577, 91 S.Ct. 1731, 1735, 29 L.Ed.2d 187 (1971); *see also Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377–78, 89 S.Ct. 1109, 1114–15, 22 L.Ed.2d 344 (1969).

Beyond the general obligation imposed by section 2, First, the RLA provides two different avenues for the resolution of disputes between carriers and labor organizations depending upon whether those disputes are "minor disputes" or "major disputes." *See, e.g., Elgin, Joliet & Eastern Ry. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1944). The Court of Appeals for the First Circuit recently summarized the well-settled law with respect to major/minor disputes as follows:

> A minor dispute contemplates an existing agreement and a disagreement regarding "the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." [Citations omitted.] Such disputes are entrusted exclusively to arbitration by the National Railroad Adjustment Board (NRAB). 45 U.S.C. § 153, First. A district court has no jurisdiction over such disputes, and thus a party may not obtain a status quo injunction.

*Brotherhood of Locomotive Engineers v. Boston & Maine Corporation*, 788 F.2d 794, 797 (1st Cir.1986). Thus, where a dispute is minor for purposes of the RLA, a carrier may continue to apply its interpretation of the agreement during the period of mandatory arbitration and no strikes are permitted over that particular issue during the pendency of the minor dispute. *Id.* A district court has no jurisdiction to enjoin conduct which is the subject of a minor dispute in an effort to resolve the dispute.[3]

---

**3.** The carriers have vigorously contended that each action of each of the carriers challenged by the Plaintiff generates only a "minor dispute" under the RLA, and as such is subject to the exclusive jurisdiction of the Adjustment Board. The claim is that the Court is without jurisdiction to adjudicate these challenges because they

raise issues concerning the interpretation and application of the existing collective bargaining agreements. This contention fails for two reasons.

First, the specific conduct on which the Court herein adjudicates the carriers to be in violation of their obligations under section 10 and section

A major dispute, on the other hand, "relates to the formation or modification of the collective bargaining agreement, including disputes over rates of pay, rules, or working conditions." *Id.* Section 2, Seventh, of the RLA, 45 U.S.C. § 152, Seventh, prohibits the carriers from changing "the rates of pay, rules or working conditions" of employees except in accordance with the strictures and procedures of section 6 of the RLA, 45 U.S.C. § 156. Thus, "if a district court finds the existence of a major dispute, it may enjoin either party from altering the status quo during the course of the negotiated proceedings mandated by section 6 of the RLA." *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.*, 788 F.2d at 797.

■ The statutory proceedings required in order to accomplish changes in agreements pursuant to section 6 are described as "purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." *Railway*

*Employees v. Florida East Coast Railway Co.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966). *See also Detroit and Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969). The procedures brought to bear by section 6 were comprehensively described by Justice Harlan:

The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 [,] Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist. § 5[,] First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both

2, First, respectively, of the RLA clearly arises out of and continues the "major dispute," which was the subject of the BMWE's section 6 notice against the MEC/PT. The essence of that "major dispute" was the BMWE's quest to change the work rules and working conditions to afford its members greater protection against the carriers' program of work force reductions through job abolishments. The conduct on which the Court adjudicates the MEC/PT to be in violation of their section 10 obligations is the implementation of the post-May 19 work force reductions through a program of job abolishments by those carriers. The conduct for which the B & M and D & H are found to be in violation of their section 2, First, obligations is their implementation of the permanent job abolishments of April 18, 1986. The carriers thus are found in violation of the RLA provisions for the same conduct which precipitated the "major dispute" of April 2, 1984 (e.g., accomplishing work force reductions by a program of job abolishments). That conduct continues the carriers' assertion of its position in the original "major dispute" and as such is an extension of it. Thus, the issues that are the basis of the dispositive adjudication of this case against each carrier are precipitated by "major disputes." Hence, the Court's line of analysis and predicate for its decision does not entrench upon the "minor dispute" jurisdictional prohibition.

Second, the carriers' focus on this jurisdictional issue is overly large in scope. Clearly, the Court may not decide questions arising out

of interpretation or application of existing terms of the collective bargaining agreement *for the purpose of providing contract relief or enforcing the specific contract provisions.* Such matters are clearly committed to the jurisdiction of the Adjustment Board. Here, however, the Court addresses a larger question: whether the carriers have violated their obligations under the RLA provisions. Such issues are clearly within, are in fact committed to, the jurisdiction of the Court. The fact that such larger issues may touch upon, or may even subsume, lesser issues involving contract interpretation and/or application does not oust the Court of its jurisdiction over issues properly within the ambit of its statutory authority under the RLA. The contrary conclusion would prevent the Court from ever considering any conduct of the carrier alleged to be in violation of the RLA provisions which also arguably could involve a question of interpretation or application of the existing contract. Indeed, most efforts to change work rules and working conditions, within the scope of section 6, could well, and usually will, also precipitate questions as to whether existing contract terms permit the attempted changes. The rule for which the carriers here contend is so overly broad in its scope that its application could well totally abolish the jurisdiction of the Court over alleged violations of the RLA provisions.

consent. §§ 5[,] First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. *While the dispute is working its way through these stages, neither party may unilaterally alter the status quo.* §§ 2[,] Seventh, 5[,] First, 6, 10.

*Railroad Trainmen v. Terminal Co.,* 394 U.S. 369, 379, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969) (emphasis added). The exhaustion of the section 6 procedures is intended to be "an almost interminable process," during which the parties bear the obligation to "make every reasonable effort to negotiate a settlement and to refrain from altering the *status quo* by resorting to self-help while the Act's remedies [are] being exhausted." *Detroit and Toledo Shore Line Railroad,* 396 U.S. 149, 90 S.Ct. 298.

The Act's status quo requirement "is central to its design." *Id.* at 150, 90 S.Ct. at 299. It is significant that the United States Supreme Court in *Detroit and Toledo* spoke of "the Act's status quo requirement," *id.* at 150, 90 S.Ct. at 299, while noting the existence of "three status quo provisions in the Act." *Id.* The Court then noted:

While the quoted language of §§ 5, 6, and 10 is not identical in each case, we believe that these provisions, together with § 2, First, form an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30–day "cooling off" period. Although these three provisions are applicable to different stages of the Act's procedures, *the intent and effect of each is identical so far as defining and preserving the status quo is concerned.* The obligation of both parties during a period in which any of these status quo provisions is properly invoked is to preserve and maintain unchanged *those actual, objective working condi-*

*tions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute.*

*Id.* at 152–53, 90 S.Ct. at 300–01. (footnotes omitted; emphasis added). Thus, the three status quo provisions of the Act are intended to operate as a continuum.

■ Once a strike occurs after exhaustion of the procedures prescribed by section 6, the obligations upon the carrier are modified to permit the struck carrier to initiate changes in work rules or conditions of employment which are "reasonably necessary" "in order to make a meaningful reality of [the carrier's] right to continue to operate [during the strike]." *Florida E.C. Ry. Co. v. Brotherhood of Railroad Trainmen,* 336 F.2d 172, 182 (5th Cir.1964). The reasonable and necessary criteria are to be strictly construed, for as the Supreme Court stated:

The collective bargaining agreement remains the norm; the burden is on the carrier to show the need for any alteration of it, as respects the new and different class of employees that it is required to employ in order to maintain that continuity of operation that the law requires of it.

*Id.,* 384 U.S. at 248, 86 S.Ct. at 1425.

### B. *Section 10 Status Quo Requirement*

#### 1. *The Scope of the Emergency Order*

Here, the strike was ended by the President's creation of the Emergency Board on May 16, 1986. Under section 10 of the RLA, 45 U.S.C. § 160, the parties were thereby required to restore the status quo, since, for a sixty-day period thereafter, "no change, except by agreement, shall be made by the parties in the *conditions out of which the dispute arose.*" 45 U.S.C. § 160 (Emphasis added.) One of the Plaintiff's principal contentions is that the effect of the Executive Order is to impose the section 10 status quo obligation upon B & M and D & H as well as upon MEC/PT. The contention is that B & M and D & H

have become "parties to the controversy" in the language of section 10 by the doctrine of "substantial alignment" as that has been developed in the jurisprudence determining the legitimacy of secondary strikes and picketing. *Brotherhood of Railroad Trainmen v. Atlantic Coastline R.R. Co.*, 362 F.2d 649 (5th Cir.) *aff'd by an equally divided court*, 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966); *Southern Railway Co. v. Brotherhood of Railway, Airline and Steamship Clerks*, 458 F.Supp. 1189 (D.S.C.1978).

▆ The Court addressed this contention preliminarily in its June 18, 1986, Bench Ruling on the Defendants' *in limine* motion to exclude evidence of "substantial alignment." The Court there held that the policy goals and interests of the parties underlying the "substantial alignment" doctrine did not necessarily address adequately the salient policy goals and party interests at stake in determining the scope of the section 10 status quo obligation once it arose. The Court, therefore, rejected "substantial alignment" as the operative test[4] to determine whether parties other than those named in the Executive Order become subject to the status quo obligations imposed by section 10. The Court now reaffirms that ruling.

Section 10, by its very design, vests authority in the President to invoke its procedures. As the Court has previously pointed out, the President's Executive Order specifically identifies the MEC/PT and certain of their employees as participants in the dispute to be investigated by the Emergency Board. The plain meaning of this designation is that only those parties, and not the D & H and B & M, are subject to the Emergency Order. This Court cannot enlarge upon, by any process of construction, a decision entrusted to and already executed by the President.

▆ This reading of the Emergency Order is also consistent with the operation of the Act. Significantly, section 6 of the Act creates its own status quo requirement. This remains in force so long as the section 6 procedures for negotiated settlement of disputes are being carried out. It can be deduced from the structure of the Act that the section 10 status quo is intended to be imposed upon a carrier and its employees *only after* the section 6 procedures have been exhausted and after the status quo related to them has ended. Section 10 provides specifically that an Emergency Board may be appointed to settle a dispute between a carrier and its employees *only* after other procedures of the RLA have been exhausted. 45 U.S.C. § 160. Here, the only parties who have exhausted the section 6 procedures are those named in the President's order. Indeed, MEC/PT is the only carrier here being struck; D & H and B & M are only the subject of secondary picketing by BMWE employees of MEC/PT. Thus, the wording of the President's order, the structure of the statutory provisions that make up the RLA, the plain meaning of both, and the content of the doctrine of separation of powers clearly indicate that the only carriers in this case properly subject to the section 10 status quo requirement are MEC/PT.

▆ Since section 10 does not apply to them, the actions of B & M and D & H and their contract employees will be assessed in light of their traditional obligations under the RLA. Specifically, the B & M and D & H were obliged to abide by (1) the section 2, First, obligation; (2) the specific terms and provisions of existing collective bargaining agreements; and (3) the content of mutually established practices in respect to rates of pay, work rules, and working conditions. These obligations were modified

---

**4.** At trial the Court indicated what might be the content of an appropriate standard to utilize in order to determine in a specific case whether parties not named in the Order could be found to be bound by the section 10 status quo obligation. *See* IT–69. In view of the reasons which the Court here finds on the specific facts of this case to dictate the conclusion that B & M and D & H are not under the status quo obligation created by Emergency Order No. 2559, there is neither occasion nor need for the Court to here pursue the question of the appropriate content of such a standard.

pursuant to the *Florida East Coast* provisions during the period of the strike when B & M and D & H were picketed.[5] The effect of the Emergency Order on the D & H and B & M was to end the secondary picketing on those carriers and thereby end the reasonable and necessary modifications permissible pursuant to *Florida East Coast.* Thus, the tripartite obligations are revivified with the same force and effect that they possessed before the commencement of the strike.

### 2. *Effect of Section 10 Status Quo on MEC/PT*

#### A. *The Effect of the Emergency Order*

With respect to MEC/PT, there is no question but that the creation of the Emergency Board imposed an obligation on both the carrier and the union to return to the status quo. The parties disagree, however, over the exact effect of that section 10 status quo requirement. The Plaintiff contends that the status quo requirement prohibits MEC/PT from making the job abolishments it made after striking workers returned to work pursuant to the Emergency Order. MEC/PT maintains that the job abolishments were not prohibited by the

terms of the pre-existing agreement or past practice when based upon economic conditions and that, therefore, the job abolishments at issue did not violate the status quo provision.

Section 10 fixes the status quo "in the conditions out of which the dispute arose." 45 U.S.C. § 160. The dispute which precipitated the strike of March 3, 1986 was first formalized in the union's section 6 notice, which was served on April 2, 1984. The dispute, as so formalized, was over the BMWE's desire to negotiate under section 6 concerning new job protection terms in the collective bargaining agreement.[6] Accordingly, the Court finds that the dispute arose on April 2, 1984, and that the status quo to which the parties are required by the Emergency Order to return is that manifested by the "actual, objective working conditions and practices, broadly conceived, which were in effect," *Detroit and Toledo,* 396 U.S. at 153, 90 S.Ct. at 301, immediately prior to the service of the section 6 notice on April 2, 1984.[7] These encompass the rates of pay, work rules and conditions of employment provided for by the existing collective bargaining agreement and/or previously established practic-

---

**5.** It does not escape the Court's notice that the *Florida East Coast* case involved as a point of fact the definition of a carrier's collective bargaining obligation where *a strike* was in effect *against the subject carrier.* So far as B & M and D & H are concerned, that is not the case; they were only the object of secondary picketing by the BMWE employees of MEC/PT. Nevertheless, the Court sees no reason why the teaching of *Florida East Coast* should not apply with equal force to a carrier which is faced with a temporary operational emergency because its employees will not cross picket lines of employees of another carrier. At least on the facts of this case, the effect of such conduct was as debilitating to the carrier's ability to operate and provide its public service as was the strike itself upon MEC/PT's operational capacity. Application of the *Florida East Coast* doctrine in such circumstances serves the same salutary purpose as where the emergency is precipitated by a strike of the carrier's own employees.

**6.** Strictly speaking, the "dispute" arose earlier, that is, in the negotiations that preceded the service of the union's section 6 notice. The evidence does not shed any light, however, on

the specific course of those negotiations. Thus, the earliest date on which the Court can, on the evidence, determine that the dispute arose was April 2, 1984, the date of service of the notice. There is no evidence that either the terms of the collective bargaining agreement or the "actual, objective working conditions and practices broadly conceived," *Detroit and Toledo,* 396 U.S. at 153, 90 S.Ct. at 301, underwent any change in the period between April 2, 1984 and the prior date on which the job protection issued was first raised in the course of the negotiations preceding service of the section 6 notice.

**7.** As noted earlier, the status quo provisions of the RLA are intended to operate in a continuum. *Supra,* at 1102–03. This case presents an anomalous situation in that the President did not appoint an Emergency Board pursuant to section 10 and thereby invoke the section 10 status quo provision until after the section 6 status quo period had expired and the parties had resorted to self-help. However, in light of the intended operation of the status quo provisions of the RLA, it is clear that even in this situation the section 10 status quo requirement operates to extend the prior status quo.

es, *id.* at 153–54, 90 S.Ct. at 301, in effect before the "dispute" arose.

The practical effect of the Emergency Order, then, was to end the strike and to require MEC/PT to permit the return of its employees to work under the conditions described above. The Emergency Order deprived the carrier, MEC/PT, of the authority under the *Florida East Coast* case to make reasonable and necessary changes, strictly construed, in work rules and conditions of employment.

### B. *The Post-May 19, 1986 Job Abolishments*

■ MEC/PT contends, and the RLEA does not disagree, that prior to April 2, 1984, and during the section 10 status quo period, it was entitled to abolish jobs based upon economic considerations. At trial, MEC/PT presented credible evidence that traffic, carloadings, and gross revenues on the MEC/PT were all significantly reduced in the months following the strike,[8] and the Court so finds. *See, e.g.,* Defs.' Exs. 13a, b and c, 12a and b, 29a–g; Tr., Vol. 2, at 497–517; Tr., Vol. 3, at 55. As of the time of trial in June 1986, traffic on the carriers had increased *vis-a-vis* the previous three-month period, but had not returned to pre-strike levels. Tr., Vol. 3, at 41–42. The

Court concludes that after the return to work on May 19, MEC/PT, consistent with its section 10 status quo obligations, would have been justified in implementing an appropriately conceived and executed reduction in its work force based upon the actual economic conditions of the carriers' business after that date.

The finding that MEC/PT was entitled to reduce its work force through job abolishments pursuant to the contract and prior practice, however, is not the end of the Court's inquiry. MEC/PT, as part of its section 10 status quo obligation, was required in accomplishing job abolishments to "extend every reasonable effort to maintain agreements," that is, to act in a manner consistent with its collective bargaining agreements and past established practice. The carrier apparently acknowledges that such job abolishments must be based upon economic exigency, *i.e.,* needs arising from business conditions of the carrier. The carrier does not claim the right to achieve the subject job abolishments on any basis other than that the collective bargaining agreements and past practice permit reduction in the work force where reduced levels of carloadings and gross operating revenues create a need for them.[9]

---

8. Defendants' Exhibits 13a, b, and c graphically demonstrate these decreases and are, therefore, appended to this opinion as Appendices "A," "B," and "C," respectively.

9. The Court is in a curious position with respect to its ability to determine the specific terms of the collective bargaining agreements. The parties have not put in evidence significant portions of the collective bargaining agreements. Even those copies of the agreements marked for identification appeared to be, in most cases, only partial copies of the complete agreements. No version of a National Agreement has been put in evidence. Yet, nearly all of the witnesses have testified as to the contents of the various collective bargaining agreements in one respect or another.

The Court is fully satisfied, despite the paucity of evidence of actual contract language, that there is no disagreement over the proposition that MEC/PT collective bargaining agreements and past practices permit the carriers to make reductions in work force through job abolishments so long as a decline in business sustained by the carrier necessitates work force reductions. The President, Chief Executive Officer

and Chairman of MEC/PT, David A. Fink, testified that he decided that all MEC/PT employees would be returned to the positions which they held before the occurrence of the strike. He then testified: "And I said, we will then reduce our employment *in line with our business in accordance with our contracts.*" Tr., Vol. 3, at 133–34 (emphasis added). The Defendants concede in their post-trial briefs that the carrier's entitlement to make the reductions in the work force which occurred on MEC/PT after May 19 was in fact based upon the economic circumstances of the carrier's operation after that date. It is stated in the Defendants' brief on behalf of MEC/PT:

The Company thereupon, pursuant to its collective bargaining agreements, issued permanent job abolishment notices, with appropriate advance notice, terminating such positions *as were not needed due to the Company's 44 percent decline in business* as compared to the period before the strike.

*Id.* at 3 (emphasis added). Further, Defendants also state in the brief:

The evidence is overwhelming that the MEC's May 19 job abolishments were motivat-

■ On this basis, MEC/PT could not abolish jobs in a way calculated to punish striking workers returning pursuant to the Emergency Order. Nor could it, having determined that economic necessity justified abolishing a certain number of jobs, single out for abolishment only those jobs held by those employees who (1) were of the contract labor force or (2) being contract laborers, had exercised their organizational rights against the carrier. Rather, the carrier was required to focus only on assessing the need for continuance of a specific position, or positions, in light of the existing economic conditions. Resolution of the question of which members of the contract labor force were to fill the remaining positions and which were to be furloughed should have been left to the operation of the seniority provisions of the collective bargaining agreement.[10]

■ The methodology utilized by MEC/PT to determine job abolishments after the May 19 return to work is violative of these requirements. The principal defect of the methodology chosen is that it uses as the focus for determining which

jobs are to be abolished not the contribution to economic efficiency made by the position in the current economic conditions, but, rather, the identity of the position's incumbent. The carrier clearly selected jobs to be abolished so as to avoid retaining those employees who had not worked during the strike. This practice had the effect of telescoping the two stages of the process as properly conducted (*i.e.*, selection of job to be abolished by economic and job function criteria followed by selection of worker to be furloughed by seniority criteria) into one predetermined, and in this case self-serving, step by the carrier.

As a practical matter, this process wrote out of the labor-management relationship, in relation to these post-May 19 job abolishments, the employees' seniority rights as conferred by the collective bargaining agreements and prior practice. The workers whose jobs had been abolished could not return except to a bulletined position, where the carrier had the right to make the award on the basis of seniority. However, virtually all of the workers had improperly lost their seniority rights, after having been put to the Hobson's choice of not

ed *by business judgment reflecting a dramatic downturn in business,* and had no basis in the punishment of striking workers.
*Id.* at 15 (emphasis added).

**10.** Plaintiff has vigorously contended herein that the carrier could not make any job abolishments after the commencement of the status quo period without first coming to the Court and obtaining the Court's approval of such abolishments. Plaintiff bases this contention upon certain language contained in the *Florida East Coast Railway* case. The Court, in stating the facts of that case, observed that the District Court entered an injunction against the carrier requiring it to abide by the terms of existing collective bargaining agreements "except upon specific authorization of this Court after a finding of reasonable necessity therefor upon application of the [carrier] to this Court." *Id.* 384 U.S. at 242, 86 S.Ct. at 1422. Mr. Justice White, in his dissenting opinion, refers to this fact in the following terms: "But with the consent of the United States Court, or a state court for that matter, the carrier may now make any change essential to its continued operation." *Id.* at 249, 86 S.Ct. at 1426 (omitting footnote).
From these references, the Plaintiff concludes that the case stands for the proposition that once a section 10 status quo period is commenced, the carrier cannot make any reduc-

tions in work force pursuant to the collective bargaining agreement, or otherwise, without first obtaining specific approval of the reductions by a District Court. Clearly, the case does not so hold. Reference to the underlying District Court opinion in the case, *Florida East Coast Railway Company v. Brotherhood of Railroad Trainmen,* 336 F.2d 172 (5th Cir.1964), reflects that the District Court adjudicated, on the facts of the case, the carrier to be in violation of the section 6 status quo requirement. *Id.* at 180. The Court imposed the requirement of prior approval for subsequent reductions in force as an element of the remedy which the Court provided as a consequence of the adjudication of violation of the section 6 status quo.
Here, however, there is not, as of the time of trial, any adjudication that this carrier has violated any provision of the RLA. Indeed, the very question to be resolved in this litigation is whether such a violation has occurred. It is this Court's view that a carrier is not under any obligation to seek Court approval of reductions in force during a status quo period, or otherwise, where it has not been adjudicated to be in violation of the RLA and that requirement imposed as a remedial consequence thereof by an Order of Court.

honoring the picket lines or forfeiting seniority. *See, supra,* at 1096, n. 1. Workers displaced by job abolishments had no opportunity to "displace," on the basis of their seniority, workers who had not honored the strike. The inescapable effect was that "super seniority" was conferred upon the nonstriking worker whose job was not abolished. This changed the work rules and conditions of employment in respect to the seniority system implemented by the collective bargaining agreement.

■ Clearly, the carrier is required under section 2, First, to honor seniority rights under the agreements and to afford an opportunity for the seniority process to vindicate them. Failure to do so departs from the collective bargaining agreement as it existed prior to the "dispute" arising. The collective bargaining agreement is an "actual, objective working condition" in effect prior to the time the present "dispute" arose. Hence, the departure from the agreement is also a violation of the section 10 status quo obligation imposed as of May 16, 1986.

The carrier's method suffers from a second defect. The job abolishment program, post-May 19, is based upon the assertion that the reduction in the carrier's business levels that was occasioned by the strike requires, after May 19, fewer workers than were required before April 3, when the strike began, in order to do the available work. That may in fact be the case. The Court has found that the strike did cause a significant decline in the carrier's carloadings and gross revenues. *See, supra,* at 1105. The carrier has consistently taken the position, however, that economic necessity requires that the percentage of decline in dollar-gross revenues be translated directly into *an identical percentage decline in number of contract labor positions.* Thus, the carrier contends that, for example, a 44 percent decline in gross revenue authorizes the carrier to effect a 44 percent reduction in the number of contract jobs.

■ There is, however, no evidence whatever to suggest, even remotely, the validity of that correlation. The correlation is, for all that is shown in this record, a purely arbitrary assumption. If the carrier is to justify the post-May 19 job abolishments on the basis that economic conditions precipitated by the strike necessitate fewer positions, it must do so by some discrete, analytical process supported by evidence relating to the impact of revenue reduction and job function upon operating efficiency. This the carrier has not done.

There is no reason to suppose, and a great deal of reason not to believe, that a percentage decline in gross revenues or in carloadings translates directly, as a matter of economic impact, into a need for an identical percentage reduction in the number of contract labor jobs. Economies of scale in the various operating sectors of the carrier are thereby ignored and were apparently never explored. There is no indication that any effort was made, or consideration given, to spreading the impact of work force reductions between management and contract labor. One cannot help but reflect on the possibility that abolishment of large numbers of labor positions, as occurred here, must eventually give rise to some reduction in the need for supervisory personnel. It is not explained why the carriers chose to put the full burden of work force reductions in an emergency situation upon the contract labor force. The failure to even consider these and other alternative factors resulted, in the Court's view, from the carrier's predetermined, and improper, design to reduce the work force *by eliminating strikers as employees.*

The post-May 19 job abolishments on the MEC/PT clearly violated the carrier's obligation not to make changes in work rules or working conditions except in conformity to section 6 and section 2, Seventh, of the RLA. As such, they constitute violations of the section 10 status quo obligation imposed upon the carrier by the creation of the Emergency Board.[11] On the foregoing

---

**11.** In addition, these job abolishments are also a

violation of the carrier's section 2, First, obli-

basis Plaintiffs are clearly entitled to the benefit of appropriate equitable relief to redress these violations.[12]

## IV. *The B & M and D & H Return to Work*

In considering the effect of the issuance of the Emergency Order on the B & M and D & H, the carriers' officers deduced, Tr., Vol. 3, at 141, correctly as it turns out, that the Order imposed no obligation upon those carriers under section 10 of the RLA to return to work those employees who had honored the picket lines of MEC/PT's BMWE employees. They then concluded, incorrectly as it turns out, that the carriers were under *no* obligation to return those employees to work on May 16. On that basis, the unions' offers on behalf of those employees to return to work after May 16, 1986 were rejected. The carriers took the position that none of these employees could return to work until the carriers had assessed their work force needs in light of the current business conditions on the carriers and had bulletined new positions for appointment on the basis of that assessment. Thus, the carriers said, the work force employees who had honored the BMWE picket lines could return only by bidding on the bulletined positions and on being awarded a position pursuant to the pertinent collective bargaining agreements.

■ The predicate for the carriers' conclusion that they were under no obligation to return the subject employees to work was that the employees were without positions as of May 16 because of the permanent job abolishments accomplished on April 18. But for these abolishments the carriers would have been required to return the employees to work as of May 16 in the positions that they had held before commencement of the secondary picketing on those carriers. This is so because the issuance of the Order ended the strike of MEC/PT's BMWE employees against that carrier. With the end of the strike those employees ended their secondary picket against the B & M and D & H. With the end of the secondary picketing, the emergency ended on those carriers. Pursuant to the collective bargaining contracts and the provisions of the RLA, the employees who had been honoring the picket lines were entitled to return to work and the carriers were obliged to facilitate their doing so. The section 2, First, obligation to "exert every reasonable effort to ... maintain agreements" reinforced this obligation, as did the requirements of section 2, Seventh, which prohibited changes in rules and working conditions except through the collective bargaining processes mandated by Section 6.

The carriers recognized that such would be their obligation. The carriers' President and Chief Executive Officer, Mr. Fink, testified that he approved the decision to implement the April 18 job abolishments. Tr., Vol. 3, at 86–181. The "primary consideration" for the approval of those permanent abolishments was to avoid having to take back the employees on those carriers who were honoring the picket lines if the strike was ended by a Emergency Order. *Id.* at 181–82. This is a clear admission that the carriers recognized their obligation to take back the subject employees on issuance of the Emergency Order. Failure to do so would clearly be a breach of the carriers' section 2, First, obligation to exert every

gation to exert every reasonable effort to maintain its agreements. By selectively abolishing positions occupied by strikers and failing to properly determine the scale of abolishments required in order to effectively meet the economic emergency, the carrier improperly infringed upon the contract rights of the union labor force. The job abolishment program, as executed on the MEC/PT, became a cynical effort to undermine and destroy the collective bargaining agreements then in effect.

**12.** Plaintiff makes a multitude of other claims of violations by MEC/PT of rights of workers under either the RLA or contract/practice provisions of the collective bargaining agreement which are based upon specific factual situations. In view of the resolution reached herein with respect to the post-May 19 job abolishments, the Court need not reach issues so generated. Since the section 10 status quo period expires on July 21, 1986, the need for an expeditious decision militates against lengthy consideration of such issues.

reasonable effort to maintain contracts. The Court is fully satisfied that Mr. Fink and the carriers' other labor management executives were well aware of that fact.

Mr. Fink's testimony also established beyond cavil that the primary reason for the April 18 job abolishments was to avoid that obligation. No other reason was given for making, at that time, those *permanent* abolishments. The workers were then honoring the BMWE picket lines, and the carriers had already temporarily abolished the positions of all employees who were doing so for the period of the economic emergency created by the secondary picketing. Indeed, there is no basis on which the carriers can justify making, at that particular point in time, *permanent* job abolishments unless the carriers' officials could accurately foresee the future.

Thus, the making of *permanent* job abolishments for the primary reason of avoiding the return of the subject employees when the strike ended was nothing less than a deliberately calculated, anticipatory breach of those obligations which the carriers recognized they would incur under the agreements and the RLA provisions upon the ending of the strike. That entire course of conduct was intended to put the carriers in a position to dishonor those obligations in the future.

The Court is satisfied that the management personnel of these carriers well knew the proper process to follow if business conditions after May 16 justified furloughing some of these employees. They knew they were required to honor the obligation to return the employees to work under the agreements on the ending of the strike and then begin a proper process of work force reductions by job abolishments based on considerations of economic conditions and job function which would permit the exercise of seniority rights to determine which employees were to be furloughed because of the abolishments. The unjustified job abolishments on April 18 (which are unjustifiable by any proper standard)[13] were a cynical attempt to undermine the employees' contract rights at the end of the strike for the avowed purpose of "avoid[ing] an influx of people if the strike ended." *Id.* at 182. Yet, the right of the employees to such a return to work was properly secured to them by the RLA provisions as well as by the terms of the collective bargaining agreement.

Thereby, the carriers sought to avoid the employees' rights and the need to return the employees to work until a proper process of job abolishment could be implemented. Also, the operation of the seniority system to permit those of the employees who had seniority over the workers who remained on the job during the secondary picketing to displace the latter employees was rendered totally ineffective. In effect, "super seniority" was thereby illegally conferred on those employees who had remained at work.

The parties have vigorously disputed the propriety of the carriers' conduct in insisting upon the employees' compliance with work rules requiring the filing of names and addresses by furloughed workers and timely exercise of displacement rights.

---

**13.** The carriers do not seek to justify these job abolishments under the reasonable and necessary modifications rule of *Florida East Coast Railway, supra,* of which the carriers had the benefit on April 18. *See, supra,* at 1104, n. 5. Indeed, in oral argument they expressly disavow any resort to that standard, relying entirely upon the contract terms to justify those abolishments. Even applying the *Florida East Coast* standard, however, the abolishments cannot be justified. At the time they were made on April 18th, there was no necessity for them; and it is clear that under *Florida East Coast* changes are reasonable only if they deal with *immediate* exigencies caused by the strike. It is unreasonable to make changes on the basis of an unsupported anticipation that if and when an Emergency Board was created, the business conditions of the carriers would justify furloughing *all* employees who honored the picket lines, even for as brief a period as a week or ten days. Moreover, as of May 16, 1986, the carriers had an appropriate procedure available to them consistent with their contract obligations to assess their contract labor requirements and accomplish proper adjustments in employment levels on the basis of the actual conditions as they then existed. The permanent abolishments, then, were neither reasonable nor necessary under the *Florida East Coast* case.

The carriers have contended that failure to comply with such rules was an adequate justification for their refusal to take back the employees who honored the picket lines. The Plaintiffs have countered that the rules were discriminatorily enforced on the occasions in question, had not in every instance been enforced in the past, and that the manner of enforcement violated past enforcement practice. Most importantly, the Plaintiff argues, the enforcement of the rule requiring timely exercise of displacement rights, during the period that the strike and related secondary picketing against the carriers was going on, deprived the employees of their organizational rights, that is, the right to honor BMWE's picket lines.

This whole congeries of disputes becomes academic, however, upon the Court's determination that the permanent job abolishments of April 18 were illegal. Without those permanent job abolishments there was no occasion for the employees to exercise any displacement rights. In the absence of the abolishments the employees were not permanently displaced and had no displacement rights. Those abolishments, being in violation of the RLA provisions, are without legal effect and the employees affected by them are entitled to be returned to work whether or not they complied with the subject work rules.[14]

### V. *Back Pay*

Plaintiffs seek back pay for those workers on all carriers whose jobs, the Court has determined, were lost because of the carriers' violation of the rights secured to them by the RLA. It has long been established that a district court has authority to require payment of back pay as a sanction for a carrier's having violated section 6 of the RLA. *United Industrial Workers of the Seafarers International Union v. Board of Trustees of Galveston Wharves,* 400 F.2d 320 (5th Cir.1968). The Court in *Galveston Wharves* explained:

[T]he purpose of the relevant sections of the Act is maintenance of the status quo pending conference. The employees wrongfully laid off cannot be retroactively reinstated, but they can be retroactively compensated. This does not punish the carrier. Nor does it constitute a windfall to the employees. It is the price of reconstructing the status quo; it compensates the employees for the losses incurred by their being laid off in violation of the Act.

*Id.* at 325. Such an award makes the workers whole and prevents the carrier receiving a windfall as a result of its violation of the Act. *Id.* at 326.

■ The rationale for awarding back pay for violation of the section 6 status quo provisions applies with equal force to situations, like this one, in which the Court has found a violation of the section 10 status quo obligation. That obligation is the end of the continuum of status quo provisions set forth in the Act and has, as discussed above, the same purpose and effect as the others. *Detroit and Toledo, supra,* 396 U.S. at 152–53, 90 S.Ct. at 300–01. The Court finds, therefore, on the facts of this case that an award of back pay is appropriate as against the MEC/PT for their violation of section 10.

■ The imposition of back pay here is also necessary to vindicate the employees' rights to return to work on the D & H and B & M. Such an award will serve as an incentive to the carriers to take seriously their obligations under section 2, First, of the Act. *See Chicago & Northwest Railway Co. v. United Transportation Union,* 402 U.S. at 577, 91 S.Ct. at 1735. Vindication of the workers' rights and deterrence of the conduct of the carriers are both particularly necessary here since the section 10 status quo will end in ten days, on July 21, 1986. Thereafter, the parties will

---

**14.** The Plaintiff once again generates a multitude of other issues challenging the conduct of B & M and D & H in the period following the commencement of secondary picketing against them. These issues are not addressed in view of the Court's decision that the April 18 permanent job abolishments were invalid and the effect of that conclusion, for the reason previously expressed, *supra,* at 1108 n. 12.

once again be entitled to the exercise of self-help. The bulk of the period during which the employees were entitled to be returned to work has now passed. Hence, the prospective benefit of this decision may be of short duration to the employees. Because of this circumstance, a back pay award is appropriate in order to avoid accrual of a windfall benefit to the carriers because of their illegal conduct and to secure to the employees meaningful relief for the violation of their collective bargaining rights since May 16, 1986.

ORDER

For the foregoing reasons the Plaintiff's claim for permanent injunctive relief as of May 16, 1986, is hereby *GRANTED*. It is hereby *ORDERED* that a Permanent Injunction against the Defendant carriers in the form and substance reflected by Appendix "D" hereto annexed be entered forthwith.

APPENDIX A
BOSTON & MAINE CORPORATION
DELAWARE & HUDSON RAILWAY COMPANY
MAINE CENTRAL RAILROAD COMPANY

MARKETING AND SALES DEPARTMENT

CARLOADINGS
JANUARY 1985—APRIL 1986

| MEC | | BM | | DH | |
|-----|------|-----|------|-----|------|
| MO. | C/L's | MO. | C/L's | MO. | C/L's |
| 1985 | | 1985 | | 1985 | |
| Jan. | 8,003 | Jan. | 15,555 | Jan. | 11,356 |
| Feb. | 7,805 | Feb. | 15,417 | Feb. | 11,049 |
| Mar. | 8,550 | Mar. | 16,932 | Mar. | 12,400 |
| Apr. | 8,066 | Apr. | 16,179 | Apr. | 12,301 |
| May | 8,301 | May | 17,284 | May | 12,758 |
| June | 7,751 | June | 16,908 | June | 12,094 |
| July | 7,259 | July | 15,336 | July | 11,812 |
| Aug. | 7,509 | Aug. | 16,625 | Aug. | 13,386 |
| Sept. | 6,635 | Sept. | 15,705 | Sept. | 12,930 |
| Oct. | 7,406 | Oct. | 16,502 | Oct. | 13,196 |
| Nov. | 6,629 | Nov. | 14,663 | Nov. | 12,267 |
| Dec. | 6,621 | Dec. | 15,029 | Dec. | 12,580 |
| 1986 | | 1986 | | 1986 | |
| Jan. | 7,407 | Jan. | 14,892 | Jan. | 13,466 |
| Feb. | 6,368 | Feb. | 13,905 | Feb. | 12,766 |
| Mar. | 4,515 | Mar. | 10,690 | Mar. | 11,631 |
| Apr. | 4,144 | Apr. | 6,694 | Apr. | 6,794 |

6/5/86
EVT

PENGAD-Bayonne, N. J.

DEFENDANT'S
EXHIBIT

13–A

APPENDIX B

GTI — RAIL DIVISION
CARLOADS

PENGAD-Bayonne, N. J.

DEFENDANT'S
EXHIBIT

13–B

APPENDIX C

GTI — RAIL DIVISION
PERCENT OF BUDGET

WEEKS — JANUARY 3 TO JUNE 13, 1986
□ MEC     + B&M     ◇ D&H

PENGAD-Bayonne, N. J.

DEFENDANT'S
EXHIBIT

13–C

EXHIBIT "D"

PERMANENT INJUNCTION

1. Plaintiff's claim in Civil No. 86–0122–P for a permanent injunction having come on for hearing and argument on June 18–24, 1986; and the evidence and post-trial briefs of the parties having now been considered by the Court; and the Court having this date separately made its findings of fact and conclusions of law in its Findings of Fact, Conclusions of Law, Opinion and Order filed on this date, it is hereby *ORDERED* that:

(a) The Defendant Maine Central Railroad Company, its officers, agents, servants, employees, and all others acting in concert with them, cause to be reinstated in employment forthwith, with back pay, all employees of the said carrier who held contract labor positions with said carrier on March 4, 1986, prior to the strike commenced by BMWE employees on that date and who were not returned to service after the end of said strike on May 16, 1986, and all such employees who were returned to service on or after May 19, 1986, and who were subsequent to such return to service furloughed by reason of any job abol-

ishment implemented by said carrier after May 19, 1986;

(b) The aforesaid carrier, its officers, agents, servants, employees, and all others acting in concert with them, *CEASE AND DESIST* from implementing or imposing, after the date of this Order, any furlough of any said employee, or any abolishment of a position held by any said employee, except upon authorization by further Order of this Court; and

(c) Said carrier and its officers, agents, servants, employees, and all others acting in concert therewith shall *CEASE AND DESIST* from any and all violation of the collective bargaining agreements between said employees and said carrier, and they shall each exert, pursuant to 45 U.S.C. § 2, First, every reasonable effort to maintain the existing agreements between said carrier and said employees.

2. It is hereby *FURTHER ORDERED* that:

(a) The Defendant Portland Terminal Company, its officers, agents, servants, employees, and all others acting in concert with them, cause to be reinstated in employment forthwith, with back pay, all employees of the said carrier who held contract labor positions with said carrier on March 3, 1986, prior to the strike commenced by BMWE employees on that date and who were not returned to service after the end of said strike on May 16, 1986, and all such employees who were returned to service on or after May 19, 1986, and who were subsequent to such return to service furloughed by reason of any job abolishment implemented by said carrier after May 19, 1986;

(b) The aforesaid carrier, its officers, agents, servants, employees, and all others acting in concert with them, *CEASE AND DESIST* from implementing or imposing, after the date of this Order, any furlough of any

said employee, or any abolishment of a position held by any said employee, except upon authorization by further Order of this Court; and

(c) Said carrier and its officers, agents, servants, employees, and all others acting in concert therewith shall *CEASE AND DESIST* from any and all violation of the collective bargaining agreements between said employees and said carrier, and they shall each exert, pursuant to 45 U.S.C. § 2, First, every reasonable effort to maintain the existing agreements between said carrier and said employees.

3. It is hereby *FURTHER ORDERED* that:

(a) The Defendant Boston & Maine Corporation, its officers, agents, servants, employees, and all others acting in concert with them, cause to be reinstated in employment forthwith, with back pay, all employees of the said carrier who held contract labor positions with said carrier prior to commencement of secondary picketing against said carrier on March 5, 1986 by BMWE employees of Maine Central Railroad Company and who were not returned to service after the end of said strike and secondary picketing on May 19, 1986; and

(b) Said carrier and its officers, agents, servants, employees, and all others acting in concert therewith shall *CEASE AND DESIST* from any and all violation of the collective bargaining agreements between said employees and said carrier, and they shall each exert, pursuant to 45 U.S.C. § 2, First, every reasonable effort to maintain the existing agreements between said carrier and said employees.

4. It is hereby *FURTHER ORDERED* that:

(a) The Defendant Delaware & Hudson Railway Company, its officers, agents, servants, employees, and all others acting in concert with them,

cause to be reinstated in employment forthwith, with back pay, all employees of the said carrier who held contract labor positions with said carrier prior to commencement of secondary picketing against said carrier on March 17, 1986 by BMWE employees of Maine Central Railroad Company and who were not returned to service after the end of said strike and secondary picketing on May 16, 1986; and

(b) Said carrier and its officers, agents, servants, employees, and all others acting in concert therewith shall *CEASE AND DESIST* from any and all violation of the collective bargaining agreements between said employees and said carrier, and they shall each exert, pursuant to 45 U.S.C. § 2, First, every reasonable effort to maintain the existing agreements between said carrier and said employees.

This Court reserves jurisdiction of the parties herein for enforcement of the provisions of this Permanent Injunction.

## MEMORANDUM OF DECISION AND ORDER ON MOTION FOR STAY PENDING APPEAL

This Court filed its Findings of Fact, conclusions of law, Opinion and Order on Plaintiff's Complaint for Permanent Injunction on July 11, 1986. Filed simultaneously was the Court's Permanent Injunction. On July 12, 1986, the Defendant carriers filed a Notice of Appeal and a Motion for Stay of Execution of the Permanent Injunction Pending Appeal. The Court heard counsel on July 14, 1986, and enters herewith its Memorandum of Decision and Order on the Motion for Stay of Execution Pending Appeal.

A party's entitlement to a stay of execution pending appeal, where the appeal is taken from a judgment or order granting injunctive relief, is by the terms of Fed.R. Civ.P. 62(a) and (c) made subject to the exercise of the discretion of the District Court. After carefully considering the arguments of counsel and the competing interests of the parties, together with the public interest, as they may be affected by a stay of the Permanent Injunction of July 11, 1986, the Court is satisfied, in the exercise of its discretion, that the Motion for Stay of Execution Pending Appeal should be *GRANTED* in part and *DENIED* in part.

The public interest in the implementation of the section 10 status quo, as an instrumentality of peaceful settlement of the dispute between the MEC/PT and its employees, in accordance with the will of the Congress and the President, not to mention the interest of the employees in any potential benefit of that result, far outweighs any legitimate interest of the Defendant carriers in avoiding the rehiring of employees as required by the Permanent Injunction of July 11 for the remaining seven days of the section 10 status quo period. Clearly, the granting of a stay of the injunction pending appeal would fully nullify the purpose and effect of the permanent injunction itself as the status quo period which it seeks to implement has so short a period left to run. The present interest of the employees in an immediate return to work, which the Court has found on compelling evidence to be their statutory and contract entitlement, also supports the denial of the stay of those provisions of the Permanent Injunction of July 11, 1986, which require the Defendants to forthwith return the designated employees to work in their previous positions, to cease and desist from further job abolishments without the approval of this Court, and to cease and desist from further violations of the pertinent collective bargaining agreements and requiring the performance of their section 2, First, obligation to exert all reasonable efforts to maintain existing agreements between the carriers and the employees. The Court is of the conviction that the public interest is substantially at risk if every incentive provided by the Railway Labor Act is not brought to bear to bring about a peaceful solution of the dispute over job protection that now exists.

The return to work in compliance with section 10 of the RLA is now displayed by the carriers to be the ultimate sanction which they apparently seek to avoid at all costs. The public interest demands that the status quo be revivified if only for the few days remaining under section 10. If the strike against MEC/PT is reinstituted after July 21, there is a clear and present likelihood that secondary picketing will spread to carriers all along the east coast of the United States. In the face of the potential for a long-term and serious disruption of the nation's rail transportation systems, the Congress, the President, and the public are entitled to the immediate implementation of every device provided by the Congress to bring about a peaceful settlement of the dispute.

The Court remains convinced that the immediate return to work of the employees designated in the Permanent Injunction and the carriers' immediate compliance with the RLA provisions must take place. Accordingly, the Motion to Stay the Permanent Injunction is hereby *DENIED* as to those provisions requiring immediate return to work of designated employees and the performance by the carriers of their obligations under the collective bargaining agreements and observance of the section 2, First, obligation aforesaid.

The requirement that the carrier pay the designated employees back pay on their return to work stands in a different posture, however. Under the Permanent Injunction the designated employees are entitled to approximately 35 working days of back pay accrued prior to the entry of the Permanent Injunction on July 11, 1986. As to each employee this entitlement is indisputably a significant economic benefit. However, from the carriers' point of view, it is an obligation owed to over 1700 employees and represents, by rough calculation, a liability of all of the carriers of huge proportion. Immediate payment of so large a liability, in the straitened financial conditions which the Court has recognized the carriers are now in, would impose a serious obstacle to the ability of the carri-

ers to continue to operate and to provide their public service during the rest of the negotiation period contemplated by the RLA provisions, and any subsequent strike that may occur. If paid, pending the appeal, there is little likelihood that back pay payments could be recovered by the carriers in significant part if this Court's opinion of July 11, 1986, were to be reversed on appeal. Although a payment of back pay is important for the reasons set out in the Court's Opinion, its *immediate* payment is not *essential* to the achievement of an effective return to the status quo mandated by section 10. The interests of the employees in ultimately receiving the payments to which they are entitled, if the Court's Opinion is affirmed on appeal, will be adequately protected by the continuance of the carriers' obligations upon affirmance of this Court's Permanent Injunction. The significant economic rights of the employees in respect to back pay will be adequately redressed by the liability, at that time, of the carriers' obligation to pay back pay pursuant to the Permanent Injunction. All these factors, taken on balance, persuade the Court that it is in the best interests of the public, the effective and fair enforcement of the RLA provisions, and the interests of the parties to this action to stay, pending appeal, those provisions of the Permanent Injunction of July 11, 1986, which require the specific carriers to pay the designated employees back pay on their return to work. Accordingly, the Defendant carriers' Motion to Stay will be *GRANTED* as to the back pay obligations created by the Permanent Injunction.

### ORDER

It is hereby *ORDERED*, pursuant to Fed.R.Civ.P. 62(c), that those provisions of this Court's Permanent Injunction filed on July 11, 1986, set out in §§ 1(a), 2(a), 3(a) and 4(a), which require the carriers designated therein to pay back pay to the designated employees on their return to work be, and are hereby, *STAYED* pending appeal, effective upon the filing (1) by each carrier (Maine Central Railroad Company

and Portland Terminal Company being treated for such purpose as a single carrier) of a supersedeas bond in the amount of Ten Thousand Dollars ($10,000.00, with a corporate surety, as security for payment of costs of the appeal; and (2) of a sworn affidavit of David A. Fink, President of each of the Defendant carriers, representing as fact to the Court that all employees designated to be returned to work by the several carriers in the Court's Permanent Injunction of July 11, 1986, have been returned to work or are then in the course of being immediately returned to work by the respective carriers, pursuant to the Court's Permanent Injunction of July 11, 1986. The Motion for Stay of Execution Pending Appeal in all other respects is hereby *DENIED*. The request for a stay pending application to the Court of Appeals for a stay is hereby *DENIED*.