**RAILWAY LABOR EXECUTIVES' ASSOCIATION, Appellee,**

v.

**BOSTON & MAINE CORPORATION, et al., Appellants.**

No. 86–1653.

United States Court of Appeals, First Circuit.

Argued Sept. 5, 1986.

Decided Dec. 22, 1986.

**152**

Ralph J. Moore, Jr. with whom William F. Sheehan, Richard M. Wyner, Eugenia Langan, Shea & Gardner, Washington, D.C., Charles S. Einsiedler, Jr., Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., and John Townsend Rich, Washington, D.C., were on brief, for appellants.

John O'B. Clarke, Jr. with whom Thomas P. Murphy, Kimberly A. Madigan, Highsaw & Mahoney, P.C., Washington, D.C., Craig J. Rancourt and Law Offices of Craig J. Rancourt, Biddeford, Me., were on brief, for appellee.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

 The central issue presented by this appeal is, whether under the circumstances of this case, the abolishment of certain job positions constitutes a "minor" dispute[1] subject to the arbitration provisions of existing collective bargaining agreements, or whether such actions are a violation of the substantive provisions of the Railway Labor Act, 45 U.S.C. §§ 151 et seq. (RLA), the reparation of which may be sought by recourse to the courts.[2] The resolution of

this dilemma will depend upon the answer given to the various subsidiary questions which we must first consider.

The case is another episode in the continuing labor saga of the Boston & Maine Railroad and related companies. *See Brotherhood of Maintenance of Way Employees v. Guilford Transportation Industries, Inc.,* 803 F.2d 1228 (1st Cir., 1986). The facts are somewhat convoluted. We shall recount only those that are vital to the determination of the narrow issue presented. We, of course, are bound by the factual findings of the district court, unless we conclude that they are clearly erroneous. Rule 52(a), Fed.R.Civ.P.; *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985).

## I. *The nature of the controversy*

The Brotherhood of Maintenance of Way Employees (BMWE) is a labor organization which represents, for collective bargaining purposes, the maintenance of way employees of the Maine Central Railroad Company and Portland Terminal Company (hereinafter referred to jointly as "Maine Central"). This relationship has existed for some time and has been memorialized in collective bargaining agreements between the BMWE and Maine Central.

As is normal, with the passage of time the parties sought to make changes in the contracts. Thus, on April 2, 1984 the BMWE served notice on Maine Central of its intention to renegotiate various of the existing contractual provisions.[3] BMWE "sought primarily to achieve contract terms that would (1) afford greater job protection for BMWE membership than ex-

---

1. A "minor" dispute is one concerning the resolution of grievances regarding the interpretation or application of existing collective bargaining agreements. *Brotherhood of Railroad Trainmen v. Chicago River & Ind. R.R.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); 45 U.S.C. § 153. In contrast, a "major" dispute is one which arises from the formation or negotiation of changes to agreements regarding rates of pay, rules, or working conditions. *Elgin, J. & E. Ry. v. Burtey,* 325 U.S. 711, 722–28, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945); 45 U.S.C.

§§ 155–160. A "minor" dispute is subject to the primary jurisdiction of arbitration boards created by the Railway Labor Act. 45 U.S.C. § 153; *Slocum v. Delaware, L. & W. R. Co.,* 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950).

2. *See Airline Pilots Assoc. v. United Air Lines,* 802 F.2d 886 (7th Cir., 1986).

3. *See* 45 U.S.C. § 156.

isted under the existing collective bargaining agreement and (2) limit the carrier's right to achieve reductions in the work force of contract labor by future job abolishments."[4] The propelling force behind these demands was the reduction of the maintenance of way employees from 350 to 400 in number during the 1981–82 period to 120 to 165 by October 1985.

The negotiations that followed were unfruitful. The parties exhausted the various steps provided for by the RLA and were thereafter released by the National Mediation Board (Board).[5]

On November 13, 1985, before either party resorted to self-help, the BMWE and Maine Central entered into a stipulation whereby Maine Central "agreed to a moratorium on their proposed job abolishments."[6] Both parties also assented to postponing the exercise of self-help action until after February 28, 1986.

The parties continued to meet during the moratorium in an attempt to reach an agreement, but to no avail. The *status quo* stipulation expired on February 28, and thereafter, Maine Central abolished 15 to 20 maintenance of way positions. On March 3, BMWE initiated a strike against Maine Central. It also established pickets against Boston & Maine Corporation (B & M) and Delaware & Hudson Railway Company (D & H), which are related carriers by virtue of their mutual ownership by Guilford Transportation Industries, Inc., a holding company. *See Guilford Transportation Industries, Inc., supra.* Less than

2% of the contract employees of the carriers crossed BMWE's picket lines.

Immediately upon the establishment of BMWE's picket lines against Maine Central, that carrier informed all of its employees who held contract positions that their positions were temporarily abolished. The controversy further escalated. After B & M and D & H were picketed, they abolished all of the positions covered by collective bargaining agreements. All three carriers intended to restore the jobs upon termination of the strike.[7]

On March 24, 1986, the appellees, the Railway Labor Executives' Association (RLEA),[8] filed the original complaint in this case in the U.S. District Court for Maine, seeking declaratory and injunctive relief to prevent Maine Central from taking discriminatory action against the striking employees. RLEA also sought to enjoin D & H and B & M from retaliating against the employees who refused to cross BMWE's picket lines. The carriers in their answer denied any such retaliation and specifically claimed that any actions taken by them were permissible under their collective bargaining agreement and that any claims to the contrary gave rise only to a "minor" dispute subject to the exclusive jurisdiction of arbitration boards created under 45 U.S.C. § 153.

Meanwhile, because of the spread in the conflict beyond the confines of the immediate combatants,[9] the Board on April 14 recommended to the President the appoint-

---

4. *Railway Labor Executives Assoc. v. Boston & Maine Corp.*, 639 F.Supp. 1092, 1098.

5. *See generally Railroad Trainmen v. Terminal Co.*, 394 U.S. 369, 379, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). In September 1984, the Board entered the picture at the request of the BMWE. It proffered arbitration (*see* 45 U.S.C. § 155, First), but this procedure was rejected by the BMWE on October 2, 1985. Thereafter the Board notified the parties that pursuant to 45 U.S.C. § 155, First, the *status quo* must be maintained for 30 days, without resort to self help until after the expiration of that period.

6. *Railway Labor*, 639 F.Supp. at 1098.

7. The labor contracts in question gave the carriers the right to suspend the contracts temporarily in cases of "emergency," a labor dispute being considered such a contingency. *See* App. 131, 140.

8. RLEA is an association of the chief executive officers of the principal railway unions in the United States, some of which in turn represent the employees of the carriers here in question. RLEA has standing to sue on behalf of its membership pursuant to *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

9. *See Guilford Transportation Industries, Inc., supra.*

ment of an Emergency Board as provided for in the RLA.[10] The carriers became aware of this recommendation which, if followed, would result in the issuance of a back-to-work order which they believed would prevent their taking contemplated action, and decided to permanently abolish those positions which earlier it had only "temporarily" eliminated, a decision carried out on or about April 18, 1986.

Under the provisions of the existing collective bargaining agreements, senior employees whose positions were abolished could exercise "bumping" rights[11] over junior employees, but they were required within a certain time period, in some cases, to exercise displacement by physically entering the junior employee's work area to inform him or her of the replacement, and in all cases, to commence work at the next scheduled shift. Either way this could only be done by crossing the established picket lines, an action which most employees refused to take. Virtually none of the B & M and D & H employees honoring the BMWE's picket lines exercised their bumping rights within the contractual time limits.

The agreements also provided that an employee whose position was abolished, but failed to bump could place his name and address on a hiring list, if he or she did so within a specified time period. Although theoretically the failure to sign up could result in the employee's loss of seniority, this rule had not in the past been strictly enforced by any of the carriers.

On May 16, 1986, President Reagan issued Emergency Order No. 2559 establishing an emergency board to investigate the Maine Central labor dispute. *See* 51 Fed. Reg. 18429 (May 20, 1986). The order also provided that for sixty days, "no change, except by agreement of the parties, shall be made by the carrier or the employees *in the conditions out of which these disputes arose*" (emphasis supplied).

Upon the creation of the Emergency Board by the President, all of the labor organizations representing the carriers' employees made unconditional offers to return to work immediately. Maine Central accepted this offer and all striking employees returned to the positions they held before the strike and thereafter, retained them throughout the week of May 19th. During that week, however, Maine Central issued job abolishment notices to 447 of its labor force covered by collective bargaining contracts, a figure which roughly coincided with the volume of business loss caused by the strike.

D & H and B & M, however, took the position that they would only hire after determining the carriers' work needs after the effects of the secondary pickets. These carriers then proceeded to post for bidding the needed positions, the ultimate result being that only about 50% of their pre-strike positions were reinstated.

On May 20, 1986, RLEA sought a temporary restraining order against D & H and B & M, claiming their actions violated the *status quo* provisions of the President's Order and Section 10 of RLA.[12] The district court ruled that said order did not cover either D & H or B & M. A request for a temporary restraining order against Maine Central was also denied, the court holding that Maine Central had made a substantial preliminary showing that the abolition of the positions in question was directly related to loss of business and revenues occasioned by the strike.

On May 27, 1986, the carriers unilaterally terminated the seniority of all employees who did not file their names and addresses in a timely fashion. But even then, the provision was not uniformly applied by the carriers. For example, although 145 B & M employees were notified of the seniority loss by that carrier, D & H did not apply

---

10. 45 U.S.C. § 160.

11. To "bump" means for a senior employee to displace a more junior one by virtue of longevity in employment.

12. 45 U.S.C. § 160.

that provision to its signalmen employees.[13] This provision was then selectively enforced by the carriers.

The substance of the RLEA's temporary restraining order allegations were repeated in an amendment to the complaint filed on June 16, 1986, which the carriers thereafter answered denying said contentions.

*The district court's decision*

The district court after a full trial on the request for a permanent injunction issued its opinion on July 11, 1986, 639 F.Supp. 1092. It ruled that for purposes of Section 10 of the RLA and the *status quo* provisions of the Presidential Order, April 2, 1984 was the date when the "dispute" arose between the BMWE and the Maine Central. The court concluded that both Section 10 and the Presidential Order required that neither party to that dispute make any change, except by agreement, "in the conditions out of which the dispute arose." Citing *Detroit and Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969), the court found "that the status quo to which the parties are required by the Emergency Order to return is that manifested by the 'actual, objective working conditions and practices, broadly conceived, which were in effect' ... immediately prior to the service of the section 6 notice on April 2, 1984. These encompass[ed] the rates of pay, work rules and conditions of employment provided for by the existing collective bargaining agreement and/or previously established practices ... in effect before the 'dispute' arose."[14] The court then concluded that "after the return to work on May 19, [Maine Central], consistent with its status quo obligations, would have been justified in implementing an appropriately conceived and executed reduction in its work force

based upon the actual economic conditions of the carriers' business after that date."[15] The Court ruled, however, that Maine Central had violated its Section 10 *status quo* obligations because it had singled out for abolishment "only those jobs held by those employees who (1) were of the contract labor force or (2) being contract laborers, had exercised their organizational rights against the carrier."[16] The court found that the methodology used by the Maine Central was faulty because rather than focusing on the abolishment of jobs which contributed to the economic efficiency of the then current conditions, it "clearly selected jobs to be abolished so as to avoid retaining those employees who had not worked during the strike."[17] In the court's view, the carrier acted from a "predetermined, and improper, design to reduce the work force *by eliminating strikers as employees.*"[18]

The district court's analysis as to B & M and D & H rested on different grounds. First of all it concluded, reaffirming its prior ruling, *see ante* at 154–55, that the Presidential Order specifically identified Maine Central and the BMWE as the parties covered by its proscriptions, and thus did not apply to the D & H and B & M. The court ruled, however, that this was not determinative of those carriers' obligations to return their employees to work on May 16. The court held that these carriers' April 18 permanent job abolishments were carried out as an "anticipatory breach of those obligations which the carriers recognized they would incur under the [collective bargaining] agreements and the RLA provisions upon the ending of the strike."[19] This "anticipatory breach," the court ruled, violated "the carriers' section 2, First, obligation to exert every reasonable effort to maintain contracts."[20] The district court

13. Twenty-four out of the twenty-six signalmen failed to comply, yet none lost their seniority.

14. *Railway Labor* 639 F.Supp. at 1105–06.

15. *Id.* at 1105.

16. *Id.* at 1106.

17. *Id.*

18. *Id.* at 1108, emphasis in the original.

19. *Id.* at 1109–10.

20. *Id.* at 1109.

held that "the right of the[se] employees to ... return to work was properly secured to them by the RLA provisions as well as by the terms of the collective bargaining agreement." [21] In conclusion the court determined "that the permanent job abolishments of April 18 were illegal," [22] and the employees affected were entitled to return to work whether or not they complied with the timely exercise of the contractual displacement rights.

The Court found that it was appropriate to grant back pay as a remedy to correcting Maine Central's *status quo* violations. It also found that remedy appropriate against D & H and B & M "because of their illegal conduct and to secure to the employees meaningful relief *for the violation of their collective bargaining rights* since May 16, 1986." [23]

Appellant carriers challenge the district court's ruling principally on the ground that the disputes are "minor" ones, involving the interpretation of the collective bargaining contracts, and thus subject to the exclusive jurisdiction of the adjustment boards. In our view, because the Maine Central controversy presents different underlying legal principles than that involving D & H and B & M, it is subject to a different analysis and results.

*The Maine Central dispute*

Basic to Maine Central's argument is its contention that the job abolishments after the Presidential Order went into effect, were actions "arguably" warranted by the existing collective bargaining contract. This argument is premised on a line of cases decided in this circuit, starting with *Airlines Stewards and Stewardesses Ass'n v. Caribbean Atlantic Airlines, Inc.*, 412 F.2d 289 (1st Cir.1969), in which we held that "where the railroad asserts a defense based on the term of the existing collective bargaining agreement, the controversy may not be termed a major dispute unless the claimed defense is so obvi-

ously insubstantial as to warrant the inference that it is raised with intent to circumvent the procedures perceived by § 6 for alteration of existing agreements." *Id.* at 291. We further refined this test in *Carbone v. Meserve*, 645 F.2d 96 (1st Cir.1981), in which we stated that if it is even "arguable" that the railroad's action was one warranted by the collective bargaining contract and not one without any basis in the contract, the dispute was a "minor" one subject to the adjustment board's exclusive jurisdiction. As recently as April 19, 1986, we reaffirmed the *Carbone* statement when we said that "our task is not to arbitrate this dispute, but to determine if 'it is even arguable' that the railroad's action was warranted by the contract." *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.*, 788 F.2d 794, 798 (1st Cir.1986).

■ As the district court correctly ruled, for purposes of Section 10 and the Presidential Order, April 2, 1984 is the crucial date in determining the conditions that must prevail regarding the *status quo*. It is the "actual, objective working conditions and practices, broadly conceived," [24] existing on that date that are the standard for the parties' *status quo* obligations.

■ Focusing on that date, it is undisputable that Maine Central had the contractual right to abolish jobs permanently. In fact, as previously indicated in this opinion, it was the BMWE's desire to curtail Maine Central's contractual rights to so act that caused BMWE to serve the April 2, 1984 notice on Maine Central in the first place. Thus Maine Central's right to carry out job abolishments, even after the Presidential Order, remained unaffected because that right *was* part of the *status quo*.

If the sole issue presented to the district court were one in which the issue was whether or not Maine Central had the right under the collective bargaining contract to

---

21. *Id.* at 1110.

22. *Id.* at 1110.

23. *Id.* at 1110. Emphasis supplied.

24. *Detroit and Toledo Shoreline Railroad Co., supra.*

abolish jobs, we would unquestionably be required to reverse that court and to order submission of that controversy to arbitration before the adjustment board. Such a question would clearly involve a "minor" dispute requiring the interpretation or application of an existing collective bargaining agreement. *Brotherhood of Railroad Trainmen, supra.* But the framing of the Maine Central issue in such terms is obviously a red herring. No one, except Maine Central in its obfuscation of the questions presented, claims that is an issue or that Maine Central lacks the power to abolish jobs pursuant to the collective bargaining agreement after the Presidential Order of May 20, 1986. RLEA *agrees* that Maine Central has that contractual right (*see* Appellee's Brief at page 23), and the district court *specifically so ruled.*[25]

The real question as respects the Maine Central controversy is whether a claim that the carrier has discriminated against its employees because they have engaged in activities protected by the RLA falls within the jurisdiction of the adjustment boards, or whether such an allegation may be brought in the courts. Contrary to Maine Central's assertion, the cases cited above, *see ante* at 156–57—holding that a contract defense renders a dispute minor, rather than major, so long as the claimed defense is arguable—are inapposite. The case against Maine Central presents a claim of *statutory* violation. In our opinion such a controversy involves the substantive rights protected by the RLA and is within the competency of the district courts because these are claims that cannot be resolved by interpretation of the collective bargaining agreement. *Railroad Trainmen v. Howard,* 343 U.S. 768, 774, 72 S.Ct. 1022, 1025, 96 L.Ed.2d 1283 (1951) ("The claims here cannot be resolved by interpretation of a bargaining agreement so as to give jurisdiction to the Adjustment Board ...."); *Conrad v. Delta Air Lines, Inc.,* 494 F.2d 914, 917–18 (7th Cir.1974) (suit alleging that RLA was violated by discharge motivated by anti-union animus states a judicial claim and is not committed to the jurisdiction of adjustment board because it does not arise from differing interpretations of collective bargaining agreements); *Air Line Pilots Association v. United Air Lines, Inc., supra,* (same); *Intern. Ass'n of Machs., etc. v. Northwest Airlines,* 494 F.2d 914, 918 (7th Cir.1974) (same, dicta); *Brotherhood of Railroad Train. v. Central of Ga. Ry. Co.,* 305 F.2d 605, 607–09 (5th Cir.1962) (same); *Brotherhood of Railroad Trainmen v. Smith,* 251 F.2d 282, 284–86 (6th Cir.1958) (same). *See also Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 924–27 (1st Cir.1983).

■ Section 3 of the RLA [26] establishes adjustment boards for the purpose of arbitrating "disputes between an employee or group of employees and a carrier or carriers growing out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153, First(i). This language clearly *limits* the grievances which mandatorily must be submitted to the adjustment boards to those arising out of the collective bargaining agreement. *Elgin, J. & E.R. Co. v. Burley,* 325 U.S. 711, 723–26, 65 S.Ct. 1282, 1289–91, 89 L.Ed. 1886 (1944). This of course, includes discharge disputes which "arguably" grow out of grievances or contract interpretation. *Radin v. United States,* 699 F.2d 681 (4th Cir.1983). But, where the terms of a contract or rights arising therefrom are not at issue, but rather the claims involve statutory obligations imposed by the RLA, discriminatees, even though covered by collective bargaining contracts, have available judicial remedies to enforce their *statutory* rights. *Railroad Trainmen v. Howard, supra; Conrad v. Delta Air Lines, Inc., supra; Steele v. L. & R. Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); *Mavis v. Brotherhood of Ry., Airline & S.S. Clerks,* 585 F.2d 926, 928 (8th Cir.1978); *Airline Pilots Assoc. v. United Airlines, supra.*

**25.** *See ante* at 155.

**26.** 45 U.S.C. § 153.

Appellants have not pointed to any contractual provision giving the adjustment boards jurisdiction over *this* type of controversy, i.e., a claim of an RLA violation. Curiously enough, neither party offered into evidence the arbitration clause of the collective bargaining agreement.[27] We thus must assume that there is nothing definitive in the contract at the very least indicating the intention of the parties to submit statutory violations to arbitral jurisdiction.[28]

■ Where a case such as this one presents a claim of violation of the RLA and a defense that the challenged action was permitted by the collective bargaining agreement, the district court must *weigh and assess the merits* of the parties' positions to determine the question of *its jurisdiction. International Association of Machinists & Aerospace Workers v. Northwest Airlines,* 673 F.2d 700 (3d Cir. 1982) (suggesting in detail the analysis that a district court should undertake). If the court finds merit to the claim that substantive rights protected by the RLA are at stake, the controversy is properly before the district court. *See Railroad Trainmen v. Howard, supra,* and other cases cited *ante* at p. 157.

■ The RLEA alleged, and the district court found, that Maine Central chose to abolish the jobs of those employees who had engaged in protected activity. This finding is supported by the evidence and must be honored by this appellate court. Rule 52(a), Fed.R.Civ.P. There is no question but that such action is contrary to the rights of employees as established in Section 2, Fourth, of the RLA.[29] It is fallacious to contend that the abolishment by the Maine Central of job positions *in retaliation for the employees' having engaged in activities protected by the RLA* is warranted by the collective bargaining agreement. Maine Central points to no such language, and were such a provision to exist, it would be clearly invalid as contrary to law. 29 U.S.C. § 152, Fourth.

The district court was thus correct in assuming jurisdiction over the Maine Central suit. As seen above, however, the legal basis for affirming jurisdiction over the Maine Central dispute is validated on somewhat different grounds than those used by the district court.

*The remedy*

■ The district court issued an injunction reinstating Maine Central's employees and ordering back pay to all employees who were not returned to service after the end of the strike, and to all employees who were returned but were thereafter furloughed by reason of the May 19 job abolishments. Such a remedy is, on its face, appropriate to correct Maine Central's discriminatory actions.

Maine Central challenges the back pay implementation alleging that even if the job abolishments were properly invalidated, full back pay for the entire 50-day period between May 19 and July 14 (when these employees were reinstated in compliance with the court's order) will give the employ-

---

**27.** *See Railway Labor* 639 F.Supp. at 1105 n. 9.

**28.** We leave for another day the validity of such contractual provision in the context of the RLA. *Compare Barrentine v. Arkansas-Best Freight Systems,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1980) (employees with claims under the Fair Labor Standards Act are not required to proceed through collective bargaining arbitration but may file action in court); *Alexander v. Gardner-Denver,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1973) (same result as regards Title VII claims).

**29.** 45 U.S.C. § 152, Fourth:
Employees shall have the right to organize and bargain collectively through representatives of their own choosing.... No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization....

ees a "windfall," because they should only receive back pay to the date when they would have validly been terminated in the absence of anti-union animus. *See Mastell Trailer Corp. v. N.L.R.B.*, 682 F.2d 753, 755–56 (8th Cir.1982). Maine Central points to the fact that after the judgment was entered in this case, the district court approved, and the Maine Central carried out, a number [30] of job abolishments, after giving the specified advance notice. Maine Central thus claims that on May 19, the most that those employees whose jobs were abolished with court approval were entitled to was the 5 days' pay equivalent to the contractual advance notice requirement. Appellee's arguments to the contrary are vague, confusing and not convincing.

There is no question but that the purpose of equitable relief of the nature here in question is to make the aggrieved party whole. As previously stated, the remedy granted, on its face, does not appear inconsistent with that principle. The implementation of that remedy, however, may be another matter.

■ Although the district court stayed the back pay remedy pending this appeal, the parties have pointed to no definitive ruling of the district court on this issue nor do we find one in the record before us. Because questions of compliance with a decree are best handled at the trial level, we are of the view that the interpretation of the decree in question is best left, in the first instance, to the issuing court. Thus the question raised regarding the appropriate back pay due is remanded to the district court for reexamination.

*The dispute of D & H and B & M*

As previously indicated, the district court's ruling as to D & H and B & M's

actions stand on a different footing. It did not find the job abolishments a violation of the Presidential Order, because the order was inapplicable to them. Furthermore no discriminatory motive was attributed to these carriers, or at least no finding to such effect underlies the court's conclusions. Instead the court ruled that they engaged in an "anticipatory breach" of the collective bargaining agreements and of Section 2, First of the RLA [31] by failing to maintain said agreements. The court concluded that it had jurisdiction to hear such a controversy and ruled for plaintiffs.

■ The district court's opinion is significantly bare of any citations in support of this ruling. It would seem that *any* breach of an existing collective bargaining agreement, whether "anticipatory" or otherwise, is precisely what an arbitrable "minor" dispute is concerned with. *Brotherhood of Railroad Trainmen v. Chicago River & Ind. R.R., supra.* Whether a party is in breach of a collective bargaining agreement, "anticipatorily" or not, requires "the interpretation [and] or application" of that agreement. *See* 45 U.S.C. § 153, First (*l*). Where such application or interpretation is central to the attempted exercise of allegedly existing rights, a "minor" dispute exists which should be litigated before the adjustment boards. *Illinois Central R. Co. v. Brotherhood of R.R. Trainmen*, 398 F.2d 973 (6th Cir.1968).

■ It is undisputed that D & H and B & M had the contractual right to abolish jobs. The action that they took was "arguably" within their contractual rights. Any challenge to this action which is not based on a violation of specific statutory rights, is without the court's jurisdiction and must be processed before the adjustment boards. *Caribbean Atlantic Airlines Inc., supra;*

---

**30.** Although a total of 725 jobs were abolished, it is not clear from the record, how many of these were Maine Central positions or contract positions.

**31.** 45 U.S.C. § 152, First:
It shall be the duty of all carriers, their officers, agents and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

*Carbone, supra; Brotherhood of Locomotive Engineers, supra.* The decision of the district court as to the D & H and B & M dispute is thus reversed and remanded with instructions that it be referred to the appropriate adjustment boards.

*The decision of the district court is affirmed in part, reversed in part, and remanded for action consistent with this opinion.*