**NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff, Appellee,**

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, Defendants, Appellants.**

**James Robert McCARTHY, et al., Plaintiffs, Appellants,**

v.

**NATIONAL RAILROAD PASSENGER CORP., Defendant, Appellee.**

**Nos. 89–1262, 89–1523.**

United States Court of Appeals, First Circuit.

Heard Oct. 3, 1989.

Decided Sept. 25, 1990.

L. Pat Wynns, with whom John O'B. Clarke, Jr. and Highsaw & Mahoney, P.C., Washington, D.C., were on briefs, for defendants, appellants.

Thomas E. Reinert, Jr. with whom Morgan, Lewis & Bockius, Sally D. Garr, National Railroad Passenger Corp., Washington, D.C., and William Shaw McDermott, McDermott & Rizzo, Boston, Mass., were on briefs, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BROWN,* Senior Circuit Judge, and BREYER, Circuit Judge.

* Of the Fifth Circuit, sitting by designation.

JOHN R. BROWN, Senior Circuit Judge.

This case arises from a series of work stoppages by employees of the National Railroad Passenger Corporation (AMTRAK) at the Boston Engine Terminal (BET). Because they both derive from a common nucleus of facts, we consolidate for appellate review two decisions of the district court. *McCarthy v. National Railroad Passenger Corporation,* 712 F.Supp. 5 (D.Mass.1989) (*McCarthy*); and *National Railroad Passenger Corporation v. International Association of Machinists et al.,* (Civil Action No. 87–2340–MC, 1988 WL 82232 (D.Mass. Aug. 2, 1988) (unreported) (*Machinists*).

*Machinists* involves the propriety of a district judge refusing to vacate all of his prior orders and findings when he granted the plaintiff's motion for voluntary dismissal: (i) we affirm that decision, because we find no abuse of discretion in the trial judge's denying the defendant's request to expressly vacate his prior rulings and findings; however, (ii) we also reaffirm the principle that a voluntary dismissal without prejudice leaves the parties as if the action had never been brought and renders the proceedings a nullity.

*McCarthy,* which we also affirm, involves the disciplinary investigations of three union representatives for allegedly participating in the instigation of a strike. The issue presented here is solely a jurisdictional one. We find that the court below properly ruled that it did not have jurisdiction over the case, since: (i) disciplinary disputes are "minor disputes" under the Railway Labor Act (RLA) 45 U.S.C. § 151 *et seq.;* and (ii) even assuming a strike was not called by the union representatives, disciplinary action against them did not show sufficient anti-union animus or interference with union representation to justify alternative jurisdiction under Section 2 Third and Fourth of the RLA, 45 U.S.C. § 152 Third and Fourth.

### How It All Happened

AMTRAK operates Boston commuter rail service under contract with the Massachusetts Bay Transit Authority ("MBTA"), and the BET is the central repair facility for MBTA rail cars. In September, 1987, AMTRAK employees working at BET engaged in a work stoppage,[1] (September 1987 Strike) but returned to work after the district court (*Machinists*) entered a temporary restraining order (TRO) against the International Association of Machinists and other Appellant Unions (Unions) representing AMTRAK employees at the BET.

After a preliminary injunction hearing was begun, AMTRAK and the Unions entered a court-approved Consent Order which agreed "to return the MBTA Commuter Service to normal, pre-September 1, 1987 procedures and service levels," (September 1987 Consent Order). In addition, the September 1987 Consent Order memorialized certain other agreements between AMTRAK and the Unions, including: (i) compliance with hard hat and safety goggle rules; (ii) return to service of certain strike participants pending discipline investigations and expedited processing of their discipline grievances; (iii) a commitment to meet and discuss safety issues; and (iv) a commitment to raise compensation issues only through collective bargaining.

On May 24, 1988, an AMTRAK employee, Kevin Casey, sustained an injury during work. Pursuant to carrier policy, AMTRAK managers directed that Casey be tested for drugs. Appellants James McCarthy, Frank Newcomb, and Paul O'Riley (Union representatives) met with AMTRAK managers to protest the drug testing of Casey (May 24th meeting). As a result of occurrences at this meeting, AMTRAK employees began leaving the BET premises and picketing on the afternoon of May 24th.

AMTRAK and the Union representatives dispute what transpired at the May 24th meeting. According to AMTRAK, McCar-thy called a strike. Edward Brown, an assistant manager at the BET who was present at the May 24th meeting, testified that during the meeting McCarthy asked to use the telephone. Brown recalled McCarthy stating: "District 22. This is 318. I would like to leave a message for Joe and Bill. Commuter rail operation both North and South side is shut down." Another AMTRAK manager at the May 24th meeting, Robert Bourget, facility manager for the BET, agreed that McCarthy used the same words as overheard by Brown.

The Union representatives, on the other hand, deny that McCarthy used the words ascribed to him by Brown. Instead, they claim that Bourget announced during the May 24th meeting that "as of 1:40 p.m. all the employees are off the clock." McCarthy then used Bourget's telephone to call the IAM district office and said, while looking at Bourget, that the BET was shut down as of "shall we say 1:45 p.m."

AMTRAK successfully sought a TRO (*Machinists*) against the May 24th work stoppage (May 1988 Stoppage), and initiated disciplinary investigations against the three Union representatives. Following a hearing in June, 1988 before the AMTRAK Hearing Officer, McCarthy was discharged from employment, but on appeal the Public Law Board, in a decision dated August 13, 1989, reduced his punishment to a 60 day suspension. O'Riley was initially given a 60 day suspension, but this was reduced to 30 days on appeal before the Public Law Board in June 1989. Newcomb, meanwhile, tendered his resignation to AMTRAK prior to his investigatory hearing.

On the afternoon of May 24th, the Unions immediately moved to dissolve the TRO obtained by AMTRAK. Following a full evidentiary hearing on the motion to dissolve the TRO, at which the Union representatives and others testified, the district court in August, 1988 denied the Unions request to dissolve, and issued a memorandum and order finding that McCarthy

---

**1.** AMTRAK contends that the Unions initiated and continued for over a week a work slowdown at the BET, followed by concerted strikes and picketing. The Unions deny that they initi-ated, engaged in or encouraged a slowdown or walkout but admit that some BET employees engaged in a strike and picketing.

had in fact called a strike on May 24th (August 1988 Memorandum and Order). The court also found that the dispute over AMTRAK's implementation of a policy requiring that employees involved in Federal Railroad Administration (FRA) reportable accidents submit to drug testing was a "minor dispute" under the RLA.

In February, 1989, AMTRAK presented a Motion for a Voluntary Dismissal Without Prejudice, because there was no present threat of a work stoppage at the BET that would justify a continuation of the *Machinists* case. The Unions indicated that they did not oppose the voluntary dismissal, so long as all the prior orders, including the September 1987 Consent Order and the August 1988 Memorandum and Order, were expressly vacated. AMTRAK objected to the vacating of the orders, for reasons which will become clear below. After hearing arguments from both sides, the court granted AMTRAK's motion for voluntary dismissal, but expressly declined to vacate the prior orders. It is that decision (*Machinists*) which is the subject of the first issue on appeal.

In July 1988, the Railway Labor Executives Association (RLEA)[2] and the Union representatives filed a complaint (*McCarthy*) in the district court seeking declaratory and injunctive relief against AMTRAK for pursuing investigations against the Union representatives and sending out warning letters to employees who had participated in the May 1988 Stoppage. AMTRAK and Railway Labor filed cross-motions for summary judgment, and in May, 1989, the district court issued its decision in *McCarthy*, which is the subject of the second issue on appeal. The court found that the parties' dispute over the discipline of the Union representatives constitutes a

"minor dispute" under the RLA, 45 U.S.C. § 151 *et seq.*, and as such is within the exclusive jurisdiction of the Adjustment Boards. The court held that Sections 2 Third and Fourth of the RLA, 45 U.S.C. § 152 Third and Fourth, did not create federal court jurisdiction to review the disciplinary actions.

In reaching the May 1989 decision in *McCarthy*, the district court did expressly cite and rely on the September 1987 Consent Order in the *Machinists* case, which the Unions unsuccessfully sought to have vacated below, (but which was nevertheless dismissed without prejudice). In addition, the district court relied on the factfinding from the August 1988 Memorandum and Order, when it stated that the May 1988 Stoppage "involve[d] the discipline of union members for having engaged in illegal strike activities and involve[d] a dispute that can only be characterized as minor." *McCarthy*, 712 F.Supp. at 8.[3]

To summarize these rather tangled proceedings, then, we are deciding the appeals of two decisions: (i) the refusal in *Machinists* of the court to expressly vacate the September 1987 Consent Order and the August 1988 Memorandum and Order when it dismissed *Machinists;* and (ii) *McCarthy*, in which summary judgment was granted against a challenge to the discipline of the Union representatives.[4]

## ISSUE I.: WAS THE VOLUNTARY DISMISSAL WITHOUT VACATION OF PRIOR ORDERS PROPER?

The Unions maintain that the district court was required as a matter of law to vacate the findings and rulings from the September 1987 Consent Order and the August 1988 Memorandum and Order when it

---

2. Appellant Railway Labor Executives Association is a national organization encompassing the leadership of the various railway unions. For ease of reference, all the Appellants will be referred to as "Railway Labor."

3. While *McCarthy* relied explicitly on the September 1987 Consent Order, its reliance upon the findings in the August 1988 Memorandum and Order are only implicit. Thus, *McCarthy* states that the BET employees "engaged in illegal strike activities" over a "minor" dispute in

the May 1988 Stoppage, but does not give a basis for this claim.

4. District Judge John McNaught issued the August 1988 Memorandum and Order in *Machinists,* the voluntary dismissal in *Machinists,* and the summary judgment in *McCarthy.* However, a different district judge, David Nelson, signed the September 1987 Consent Order and the TRO's in *Machinists.*

granted AMTRAK's February 6, 1989 motion for voluntary dismissal in *Machinists*. To support their argument for the mandatory vacating of these prior orders, the Unions rely (by analogy) primarily on the *Munsingwear* doctrine, which imposes a duty upon the appellate court to vacate a district court decision, if such decision has become moot while on appeal. *See Great Western Sugar Co. v. Nelson*, 442 U.S. 92, 99 S.Ct. 2149, 60 L.Ed.2d 735 (1979); *United States v. Munsingwear*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950); *Duke Power Co. v. Greenwood County*, 299 U.S. 259, 267, 57 S.Ct. 202, 205, 81 L.Ed. 178 (1936).[5]

■ "The reason for vacating a lower court's decision when the case becomes moot pending appeal is to make sure that a decision of which the losing party was denied appellate review will not have preclusive effect in subsequent litigation between the parties." *Commodity Futures Trading Comm'n v. Board of Trade*, 701 F.2d 653, 656–57 (7th Cir.1983); *see also Munsingwear*, 340 U.S. at 40, 71 S.Ct. at 107. A case that becomes moot pending appeal, necessarily untested by appellate scrutiny, lacks the "stamp of reliability" that is required to warrant "preclusive effect." *CFTC v. Board of Trade*, 701 F.2d at 657. Thus, where a case on appeal is dismissed because it has become moot, the court *must* order that the district court's judgment be vacated. *See Great Western Sugar Co. v. Nelson*, 442 U.S. at 94, 99 S.Ct. at 2150.

■ However, the procedural context here does not involve either a final decision of a district court or a matter of mootness pending appeal. Rather, the issue is whether a district court in granting a voluntary dismissal was required expressly to vacate prior orders such as those in the nature of preliminary injunctions, memorandum opinions, etc. The Unions have directed us to no case that *requires* a district court to expressly vacate prior orders in a voluntary dismissal pursuant to F.R. Civ.P. 41(a)(2). While the procedural posture of the *Munsingwear* line of cases is analogous to the circumstances *sub judice*, we are not prepared at this time to circumscribe the broad discretion of the district court to attach such conditions as it sees fit when granting a motion for voluntary dismissal. *See Puerto Rico Maritime Shipping Authority v. Leith*, 668 F.2d 46, 49 (1st Cir.1981) ("[t]he district court's decision to grant a motion to dismiss under Rule 41(a)(2) is reviewable only for abuse of discretion.")

■ Of course, it is well settled that "[t]he effect of a voluntary dismissal without prejudice is to render the proceedings a nullity and leave the parties as if the action had never been brought." *In re Piper Aircraft Distribution System Antitrust Litigation*, 551 F.2d 213, 219 (8th Cir. 1977).[6] This means that the dismissal "carries down with it previous proceedings and orders in the action, and all pleadings, both of plaintiff and defendant, and all issues, with respect to plaintiff's claim." *Bryan v. Smith*, 174 F.2d at 214, *quoting* 27 C.J.S. Dismissal and Nonsuit, § 39. In effect, then, the doctrines of collateral estoppel and res judicata are no longer available to the court's previous opinions and orders in *Machinists*. Thus, the district court's reliance in *McCarthy* upon the September 1987 Consent Order and August 1988 Memorandum and Order was improper,[7] even though such orders had not been expressly vacated.

---

**5.** Although this principle was first enunciated by the Supreme Court in *Duke Power, United States v. Munsingwear* has become the leading case cited for this principle. *See Great Western Sugar Co.*, 442 U.S. at 93, 99 S.Ct. at 2149.

**6.** *See also Hill v. W. Bruns & Co.*, 498 F.2d 565, 567 n. 2 (2d Cir.1974), *citing A.B. Dick & Co. v. Marr*, 197 F.2d 498, 502 (2d Cir.), *cert. denied*, 344 U.S. 878, 73 S.Ct. 169, 97 L.Ed. 680 (1952); *Bomer v. Ribicoff*, 304 F.2d 427, 428 (6th Cir. 1962); *Bryan v. Smith*, 174 F.2d 212, 214 (7th

Cir.1949); *Stout v. Mason*, 17 F.R.D. 93 (E.D.Pa. 1954); Annot., 11 A.L.R.2d 1407; 27 C.J.S. Dismissal and Nonsuit § 39 (1959).

**7.** AMTRAK attempts to argue that the prior holdings and findings in the *IAM* case can still be given later preclusive effect, and cites the *CFTC v. Board of Trade* decision for this proposition. However, in *CFTC v. Board of Trade*, the court refused to vacate a preliminary injunctive order against the Mercantile Exchange on the ground that the order had already been subject-

## ISSUE II.: DID THE DISTRICT COURT HAVE JURISDICTION UNDER THE RAILWAY LABOR ACT?

### *"Minor" v. "Major" Disputes under the RLA*

The distinction between "major" and "minor" disputes is central to an understanding of the dispute resolution procedures of the RLA. Congress enacted the RLA, 45 U.S.C. § 151 *et seq.,* in order to prevent disruptions of interstate commerce caused by labor disputes. 45 U.S.C. § 151a. The Act facilitates that legislative purpose by imposing mandatory procedures for resolving disputes between railroads and their employees involving collective bargaining ("major disputes") or grievances ("minor disputes").

In *Elgin, Joliet & Eastern Railway Company v. Burley,* 325 U.S. 711, 722–24, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886, 1893–95 (1945), the Supreme Court defined these two types of disputes. "Major disputes" encompassed by Section 2(4), 45 U.S.C. § 151a(4),

> [R]elate to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy.

325 U.S. at 723, 65 S.Ct. at 1289, 89 L.Ed. at 1894. In contrast, "minor disputes," included under section 2(5), 45 U.S.C. § 151a(5),

> [C]ontemplate the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or an omitted case.

325 U.S. at 723, 65 S.Ct. at 1289, 89 L.Ed. at 1894; *see also, Consolidated Rail Corp.*

*v. RLEA, (Conrail v. RLEA*) 491 U.S. ——, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989); *Carbone v. Meserve,* 645 F.2d 96, 98 (1st Cir.), *cert. denied,* 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981); *Maine Central R.R. v. United Transportation Union,* 787 F.2d 780, 781–82 (1st Cir.1986); *Boston & Maine v. Lenfest,* 799 F.2d 795, 801 (1st Cir.1986).

■ For "minor disputes," the RLA, under Section 3, 45 U.S.C. § 153, imposes a system of mandatory determination of adjustment through arbitration by the National Railroad Adjustment Board (NRAB) or other Adjustment Boards established through collective bargaining. The jurisdiction of the Adjustment Boards over "minor disputes" is exclusive; the federal district courts do not have jurisdiction to adjudicate "minor disputes" which properly belong before an Adjustment Board established under the RLA. *See Conrail v. RLEA,* 491 U.S. at ——, 109 S.Ct. at 2481, 105 L.Ed.2d at 262; *Trainmen v. Chicago River & Indiana R.R.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); *Andrews v. Louisville and Nashville R.R.,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972); *Union Pacific R.R. v. Sheehan,* 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978); *Maine Central R.R. v. United Transportation Union,* 787 F.2d at 782; *Carbone v. Meserve,* 645 F.2d at 98.

Shortly after the decision in *McCarthy,* the Supreme Court reiterated the distinction between "major" and "minor" disputes under the RLA in *Conrail v. RLEA,* 491 U.S. at —— – ——, 109 S.Ct. at 2479–82, 105 L.Ed.2d at 259–64 (U.S.1989). That case, which deals with a railroad's implementation of a drug testing program, articulates a standard for distinguishing "major" and "minor" disputes based upon whether an action is "arguably justified" by the collective bargaining agreement. 491 U.S. at ——, 109 S.Ct. at 2482, 105 L.Ed.2d at 263. In doing so, the Court

ed to appellate review, thus giving it some "stamp of reliability." 701 F.2d at 657. In ruling that the district court judge was not required to vacate his August 1980 injunctive order against the Mercantile Exchange, the Sev-

enth Circuit specifically stated, "[w]e need not decide whether he would have had to do so if his decisions had not been appealed." *Id.,* at 658.

stressed the "relatively light burden which the railroad must bear in establishing exclusive arbitral jurisdiction under the RLA." *Id.*

### Disciplinary Controversies Normally "Minor Disputes"

 The trial court correctly held in *McCarthy* that controversies involving disciplinary matters are "minor disputes" within the exclusive jurisdiction of the Adjustment Boards. *Andrews v. Louisville and Nashville R.R.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972); *see also Independent Union of Flight Attendants v. Pan American World Airways* 620 F.Supp. 447, 453 (S.D.N.Y.1985), *aff'd.* 789 F.2d 139 (2d Cir.1986); *Machinists v. Northwest Airlines*, 673 F.2d 700 (3d Cir. 1982); *see also, RLEA v. Boston & Maine Corp., (RLEA v. B & M )*, 808 F.2d 150, 157 (1st Cir.1986), *cert. denied*, 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987). In *Andrews v. Louisville and Nashville R.R.*, the Supreme Court stated:

> Provision for arbitration of a discharge grievance, a minor dispute, is not a matter of voluntary agreement under the Railway Labor Act; the Act compels the parties to arbitrate minor disputes before the National Railroad Adjustment Board established under the Act. Thus, the notion that the grievance and arbitration

procedures provided for minor disputes in the Railway Labor Act are optional, to be availed of as the employee or the carrier chooses, was never good history and is no longer good law.

406 U.S. at 322, 92 S.Ct. at 1564, 32 L.Ed.2d at 98 (quoting *Walker v. Southern R.R.*, 385 U.S. 196, 198, 87 S.Ct. 365, 366, 17 L.Ed.2d 294 (1966)). A dispute over the justification for and propriety of warnings and disciplinary investigations, as is present in the case herein, certainly falls within that class of controversies termed "minor disputes" under authoritative precedent. Consequently, we fully approve *McCarthy's* ruling that since the controversy over the warning letters sent to employees participating in the May 1988 Stoppage, and the discipline of McCarthy and O'Riley, constituted a "minor dispute" under the RLA, the court had no jurisdiction over the suit.

### Jurisdiction Under Sections 2 Third and Fourth

Even if the controversy below is accurately characterized as a "minor dispute," Railway Labor argues nonetheless that jurisdiction in federal district court is available under Section 2 Third and Fourth of the RLA, 45 U.S.C. § 152 Third and Fourth (Section 2 Third and Fourth).[8] This section

---

**8.** Section 2 Third reads in full:
*Third. Designation of representatives*
 Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.
45 U.S.C. § 152 Third
 Section 2 Fourth provides in relevant part:
*Fourth. Organization and collective bargaining; freedom from interference by carrier; assistance in organizing or maintaining organization by carrier forbidden; deduction of dues from wages forbidden.*
 Employees shall have the right to organize and bargain collectively through representa-

tives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments or other contributions.
45 U.S.C. § 152 Fourth.

aims to protect employees' designation of bargaining representatives from employer coercion or intrusion. *See id.; see also, e.g.,* H.R.Rep. No. 1944, 73d Cong.2d Sess. 2 (1934).

Railway Labor argues that by seeking disciplinary action against the Union representatives, AMTRAK (at least in the perception of rank and file members) interfered with the rights protected by Section 2 Third and Fourth. According to Railway Labor, the disciplinary investigations against the Union representatives was solely to punish them for engaging in their activities as representatives of their respective unions.[9] As such, it would be an unlawful violation of Section 2 Third and Fourth.

██ But as the Supreme Court recently stated, these sections address primarily the "precertification rights and freedoms of unorganized employees." *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* 489 U.S. 426, ——, 109 S.Ct. 1225, 1234, 103 L.Ed.2d 456, 470 (1989).[10] In a post-certification controversy such as the one here, judicial intervention under Section 2 Third and Fourth is limited to circumstances where the employer's conduct has "been motivated by anti-union animus or ... an attempt to interfere with its employees'

choice of their collective bargaining representative," *Tello v. Soo Line R.R.,* 772 F.2d 458, 462 (8th Cir.1985), or constitutes "discrimination or coercion" against that representative, *International Brotherhood of Teamsters v. Pan American World Airways,* 607 F.Supp. 609, 614 n. 5 (E.D.N.Y.1985) or involves "acts of intimidation [which] cannot be remedied by administrative means," *Local Union 808 v. P & W Railroad Co.,* 576 F.Supp. 693, 703 (D.Conn.1983). In all of the above cases, federal court intervention was found unwarranted.

*Independent Union of Flight Attendants v. Pan American World Airways,* 789 F.2d 139, 142 (2nd Cir.1986).[11] Judicial intervention would also be permitted under Section 2 Third and Fourth if the employer engaged in "a fundamental attack on the collective bargaining process," or a "direct attempt to destroy a union." *See International Association of Machinists and Aerospace Workers, AFL–CIO v. Alaska Airlines, Inc.,* 813 F.2d 1038, 1040 (9th Cir.1987), *cert. denied,* 484 U.S. 926, 108 S.Ct. 290, 98 L.Ed.2d 250.

██ Railway Labor argues that anti-union animus[12] by AMTRAK is revealed by the following reasoning: (i) for summary judgment purposes, there is a genuine issue of material fact as to whether a strike was in fact called on May 24th; (ii) the

---

**9.** McCarthy had been the local chairman of the IAM at the BET for approximately six years when the May 24th meeting occurred. O'Riley was then the local chairman of the International Brotherhood of Boilermakers and Blacksmiths at the BET, and Newcomb, a carman for AMTRAK, was the local vice chairman of the Transportation Communication Union's Carman division. AMTRAK asserts that McCarthy continues to hold his union position, but it is unclear from the record whether O'Riley or Newcomb have continued to represent their respective class or crafts.

**10.** The following excerpt from *TWA v. IFFA* gives a more complete flavor of the Supreme Court's holding:

> Section 2 Fourth was enacted as part of the 1934 amendments to the RLA. From the time of our very first opportunity to interpret the 1934 amendments, we have viewed them as addressing primarily the precertification rights and freedoms of unorganized employees.
>
> \* \* \* \* \* \*
>
> The explanation for the precertification focus of the 1934 amendments is clear. The

> RLA provides an exhaustively detailed procedural framework "to facilitate the voluntary settlement of major disputes." The effectiveness of these private dispute resolution procedures depends on the initial assurance that the employees' putative representative is not subject to control by the employer and on subsequent assurance that neither party will be able to enlist the court to further its own partisan ends.

*TWA v. IFFA,* 489 U.S. at ——, 109 S.Ct. at 1234, 103 L.Ed.2d at 470 (citations omitted).

**11.** *See also Association of Professional Flight Attendants v. American Airlines,* 843 F.2d 209, 211 (5th Cir.1988); *International Association of Machinists & Aerospace Workers v. Northwest Airlines, Inc.,* 673 F.2d 700, 710 (3rd Cir.1982).

**12.** Although technically there are differences between (i) anti-union sentiments on the part of an employer, (ii) interference with the employees' choice of their collective bargaining repre-

three Union representatives were investigated and disciplined for their activities surrounding the May 1988 Stoppage; and (iii) if a strike was not called, but Union representatives were nevertheless charged with instigating one, the disciplinary investigations of such Union representatives evidences anti-union animus as prohibited by Section 2 Third and Fourth. We may accept contentions (i) and (ii), but not the conclusion (iii), of this argument.

In its motion for summary judgment below, Railway Labor offered the transcript of testimony from the hearing of the Machinists' motion to dissolve the TRO (*Machinists*) entered following the August 1988 Strike. As discussed above, there is conflicting testimony at this hearing as to whether a strike was actually called by McCarthy, or whether management put the BET employees "off the clock." In its cross motion for summary judgment, AMTRAK filed the affidavit of Larry C. Hriczak, the Director of Labor Relations for AMTRAK. Hriczak swore that a strike had been called. Hriczak was not present at the May 24th meeting, however, so his allegations about what transpired therein are not based on personal knowledge to be competent evidence under F.R.Civ.P. 56(c). Since we have disapproved that portion of the *McCarthy* opinion which relied on the finding in the August 1988 Memorandum

and Order that McCarthy called a strike, we must hold that there was a genuine issue of material fact as to whether a strike was called on May 24th, and that summary judgment cannot be justified.

Railway Labor provided no direct proof of AMTRAK's anti-union animus.[13] Rather, their claim of anti-union animus rests solely upon the inference that animus is reflected by (i) the disciplinary investigations of the Union representatives for merely discussing with management at the May 24th meeting the propriety of Casey's drug testing, and (ii) management's fabrication that the May 1988 Stoppage was at McCarthy's instigation. Together, Railway Labor urges that these constitute evidence of anti-union animus sufficient to sustain federal court jurisdiction under Section 2 Third and Fourth. The post-certification cases finding jurisdiction under Section 2 Third and Fourth require a stronger showing of anti-union animus than this inference provides.[14]

Railway Labor relies heavily on *RLEA v. B & M*, 808 F.2d 150. In that case, this court recognized the "primary jurisdiction" of the Adjustment Boards over "minor disputes" and the potential conflict with federal court jurisdiction under Section 2 Third and Fourth. 808 F.2d at 152. In resolving this conflict, the court held that a district

---

sentative, and (iii) discrimination or coercion against the union representative, for ease of exposition we will refer to all of these violations of Section 2 Third and Fourth with the shorthand phrase "anti-union animus."

13. AMTRAK, on the other hand, did provide direct evidence about the absence of anti-union animus. In his affidavit, Hriczak attested:

> AMTRAK has continued to recognize the IAM, Carmen, and Boilermakers, as the representatives under the Railway Labor Act of the relevant employees in the crafts or classes at the Boston Engine Terminal and systemwide throughout the AMTRAK workforce. AMTRAK has taken no action to limit whom the labor organizations may designate as their representatives for purposes of representing the shop craft employees at the Boston Engine Terminal.

Railway Labor did not controvert this denial of anti-union animus by AMTRAK.

14. Because we find that Railway Labor has not shown sufficient anti-union animus on the part

of. AMTRAK *even assuming that a strike was never called by McCarthy,* we do not have to decide the other issues raised in the briefs, namely: (i) assuming *arguendo* that McCarthy did call a strike, and that the strike was arguably legal, did a disciplinary investigation of the Union representatives justify jurisdiction under Section 2 Third and Fourth?, and (ii) if the Union representatives "reasonably and honestly believed" that the strike was legal, was discipline warranted under the circumstances?

Issue (i) assumes facts suggesting less anti-union animus than the facts we have assumed in this opinion. In other words, disciplining the Union representatives for calling a (possibly legal) strike is less likely to evidence anti-union animus than disciplining them for *not* calling a strike. Thus, the first issue must be answered negatively.

The second issue, if it is an attempt to obtain jurisdiction, fails for the same reason as the first issue does; but if it is a substantive issue, we cannot reach it since we have no jurisdiction over the matter.

court should preliminarily "weigh and assess the merits" of the Section 2 Third and Fourth claims to determine whether federal court jurisdiction exists. 808 F.2d at 158. This brought into play the facts of the case. Involved was a lawful strike on the Maine Central after the exhaustion of the RLA "major dispute" procedures. After the creation of an Emergency Board by the President, Maine Central accepted the offer of striking employees to return to the positions they held before the strike. However, the following week Maine Central issued job abolishment notices to 725 employees that targeted specifically those workers who had engaged in the strike. 808 F.2d at 157–58.

Clearly, the disciplinary investigation of the three Union representatives in the case at hand, even if unjustified, does not approach the kind of extraordinary anti-union animus found to exist in *RLEA v. B & M*, which acted on the district court's finding that the carrier acted from a "predetermined, and improper, design to reduce the workforce *by eliminating strikers as employees.*" 808 F.2d at 155, *quoting and affirming Railway Labor Executives Assoc. v. Boston and Maine Corp.*, 639 F.Supp. 1092, 1108 (D.C.Maine 1986) (emphasis in original). Moreover, after the Supreme Court's recent pronouncement in *TWA v. IFFA* that the post-certification rights of unions under Section 2 Third and Fourth are narrowly circumscribed, we are especially convinced of our obligation to deny federal court jurisdiction on the facts herein.

Railway Labor also cites *Brotherhood of Ry. Trainmen v. Central of Georgia Ry.*, 305 F.2d 605 (5th Cir.1962). In that case, the Fifth Circuit reversed the district court's dismissal of a suit for failure to state a claim, F.R.Civ.P. 12(b)(6) under Section 2 Third arising from the discipline of a union representative. The union charged the railroad with pursuing an investigation of the chairman of its grievance committee for the purpose of discrediting both the individual and the union. *Id.*, at 606–07. *Central of Georgia*, like the case before us, involved pleading allegations by the union that the railroad sought "to destroy the process of collective bargaining and resolution of grievances by wrongfully destroying the effectiveness of the chosen representative." *Id.*, at 608.

With neither discovery or controverting testimony from the railroad, the court "passed only on bare bones pleadings" to initially allow the case to proceed in the district court. *Id.*, at 609. The Fifth Circuit, soon after the case was decided, limited *Central of Georgia* to its facts. *See Machinists v. Eastern Airlines*, 320 F.2d 451, 454 (5th Cir.1963). *See also, APFA v. American Airlines*, 843 F.2d 209 (5th Cir. 1988).[15]

In sum, the district court properly dismissed *Machinists*, and correctly found no jurisdiction in *McCarthy*.

AFFIRMED.

---

**15.** Further, in light of the Supreme Court's subsequent decisions in *Andrews* and *TWA v. IFFA*, *Central of Georgia* may not give sufficient deference to the importance of preserving the exclusive jurisdiction of the Adjustment Boards in post-certification "minor disputes" under the RLA. In any case, the organ of the court here is not about to commit judicial hari kari by disparaging not only a decision authored by him but perhaps criticized by his brothers/sisters. *Cf. Baesler v. Continental Grain* 900 F.2d 1193, 1195 n. 1 (8th Cir.1990) (Brown, J., dissenting); *United States v. Chantal*, 902 F.2d 1018, 1022 n. 10 (1st Cir.1990).